Submitted on record and briefs July 8, accused disbarred October 6, 1987

In re Complaint as to the Conduct of
# MARTIN J. HOWARD,
*Accused.*

(OSB 84-146, 85-22; SC S32207)

743 P2d 719

Martin J. Howard, *pro se.*

Mark J. Fucile and Gregory R. Mowe, Portland, for the Oregon State Bar.

PER CURIAM

Peterson, Chief Justice, concurred and filed an opinion.

## PER CURIAM

 The principal issue is whether the accused should be suspended or disbarred for violations of various disciplinary rules in the Code of Professional Responsibility. Two members of the trial panel of the disciplinary board decided that the accused be "permanently disbarred," and the third member, concurring in the findings of violations of the disciplinary rules, would have decided that the accused be suspended for three years.[1] The decision of the trial panel that the accused be disbarred requires review by this court. ORS 9.536(2), BR 10.1. In this court the accused argues that we should suspend him for a period of three years, but the Oregon State Bar (Bar) contends that we should disbar the accused. We hold that the accused should be disbarred.

In December 1985, the Bar filed a complaint against the accused charging him with violation of the disciplinary rules in six separate causes. The accused answered in January 1986. At the conclusion of presenting evidence in its case in chief, the Bar successfully moved to amend its complaint to conform to proof, and the accused was allowed to amend his answer to meet the new allegations.[2]

---

[1] The disciplinary board is required to make a "decision" as to the sanction where the board finds that an attorney should be disciplined. ORS 9.536, BR 10.1. The term "permanent disbarment" is inaccurate. The statutes and the rules of procedure adopted pursuant to ORS 9.005(6) and 9.542 do not use the adjective "permanent"; moreover, the rules of procedure contemplate that a member of the Bar who has been disbarred may be reinstated. BR Title 8.

[2] The Bar presented an "AMENDED FORMAL COMPLAINT," which was marked as an exhibit. A document called "inserts," which consisted of amendments to the amended complaint, was marked as another exhibit. Neither of these documents appear as part of the pleadings in the record forwarded to the court. The amendments to the answer were not made by interlineation, nor does an amended answer appear in the record.

The abstract to the accused's brief in this court contains the complaint but not the amended complaint. The Bar's brief does not specifically direct our attention to the fact that there was an amended complaint, as amended further by "inserts." It is not until the reader reaches page 229 of the transcript that one discovers the text of the amendments, which on page 243 are marked as described.

This is not the way for a trial panel to handle amendments to the pleadings. An amended pleading should appear among the pleadings. The method adopted here requires the court to search the transcript, and the late realization that there has been amendment has resulted in a false start as we noted in *In re Galton,* 289 Or 565, 572 n 5, 615 P2d 317 (1980). There, we went on to say:

"Where amendment to the pleadings is allowed by interlineation or obliteration, the chairman of the Trial Board should take care that this is physically performed

## FIRST CAUSE

The amended complaint charges the following. One O'Keefe died in February 1982, and the accused was appointed as personal representative. The accused had a personal bank account at the United States National Bank of Oregon (USNB) and a commercial account in his name at First Interstate Bank of Oregon (FIB). After the accused was appointed personal representative, the Social Security Administration (SSA) issued 11 checks for monthly benefits payable to O'Keefe. The accused endorsed and deposited the proceeds of three of these checks in his USNB account and eight in his FIB account. When he made the deposits, the accused knew that the estate of O'Keefe had no claim of right to those funds. He made little or no effort to refund the money to SSA prior to demands by the government to repay. He used the funds for his own purposes without consent of the government. He maintained incomplete records concerning the funds that he received and disbursed on behalf of the estate. He did not report to the probate court the receipt of the SSA checks. The amended complaint alleges that this conduct violated *former* DR 1-102(A)(4), *former* DR 9-102(A) and *former* DR 9-102(B)(3).[3]

---

forthwith. If amendment is otherwise allowed, counsel should be required to submit an amended pleading."

*Id.*

As we observed in *Galton,* the trial panel serves without compensation and "for the good of the order." *Id.* Other than the criticism concerning amendment of the pleadings, we have none for this trial panel. It did a fine job in trying circumstances, on which elaboration here is unnecessary.

[3] *Former* DR 1-102(A)(4), which is now substantially DR 1-102(A)(3), provided:

"A lawyer shall not: * * * [e]ngage in conduct involving dishonesty, fraud, deceit, or misrepresentation."

*Former* DR 9-102(A), which is now substantially DR 9-101(A), provided:

"All funds of clients paid to a lawyer or law firm, including advances for costs and expenses, shall be deposited in one or more identifiable trust accounts maintained in the state in which the law office is situated and no funds belonging to the lawyer or law firm shall be deposited therein except as follows:

"(1) Funds reasonably sufficient to pay account charges may be deposited therein.

"(2) Funds belonging in part to a client and in part presently or potentially to the lawyer or law firm must be deposited therein, but the portion belonging to the lawyer or law firm may be withdrawn when due unless the right of the lawyer or law firm to receive it is disputed by the client, in which

The accused answered the first cause of complaint by alleging that he advised the SSA that O'Keefe had passed away, that he deposited the checks in a bank account separate from the estate account so that closing of the estate would not be delayed by "resolution of the social security matters," that he unsuccessfully attempted to return the checks, that he notified the SSA that the funds would be retained until further instructions and that at all times funds were available to be disbursed and were disbursed on receipt of instructions from the SSA.

We consider the matter *de novo,* ORS 9.536(3), and find that the following facts are within the amended complaint and are established by clear and convincing evidence.

1. O'Keefe died in February 1982, and the accused was appointed personal representative of the estate and employed as attorney of the personal representative. The estate was closed in November 1983. During the time the estate was in probate, the accused had a separate bank account for estate funds.

2. After O'Keefe's death, the SSA continued to send her monthly benefit checks in 1982-1983. The accused endorsed 11 of them and deposited the proceeds from eight of them, totaling $4,758.90, in the FIB account and from three of them, totaling $1,800, in his USNB account. Both accounts were the accused's personal accounts. The accused concealed from the probate court the existence of these funds.

event the disputed portion shall not be withdrawn until the dispute is finally resolved."

*Former* DR 9-102(B), which is now substantially DR 9-101(B), provided:

"A lawyer shall:

"(1) Promptly notify a client of the receipt of his funds, securities or other properties.

"(2) Identify and label securities and properties of a client promptly upon receipt and place them in a safe deposit box or other place of safekeeping as soon as practicable.

"(3) Maintain complete records of all funds, securities, and other properties of a client coming into the possession of the lawyer and render appropriate accounts to his client regarding them.

"(4) Promptly pay or deliver to the client as requested by a client the funds, securities, or other properties in the possession of the lawyer which the client is entitled to receive."

3. During the time the estate was open and until June 30, 1984, the accused was a partner in the law firm of Gilley, Busey & Howard.

4. During the time the proceeds from the O'Keefe checks were in his personal accounts, the accused used the funds for numerous personal purposes and not for purposes of administering the estate.

5. The accused did not attempt to return the money until the Treasury Department began to make reclamation requests in the summer of 1984.[4]

6. When the first reclamation request came to FIB, the bank debited the accused's bank account and sent him notice of the reclamation. The bank also "froze or put a warning on his account for the remainder of funds that were still owed on the reclamation." After receiving notice of the freeze, the accused made a deposit on July 24, 1984. This deposit was in the form of a check for $2,980.20 drawn on a Pennsylvania bank in favor of Lelia MacQuarrie and endorsed in that name by the accused as attorney in fact.[5]

7. At some time during this course of events, the accused had closed the account at USNB in which he had deposited $1,800 of the O'Keefe checks from the SSA.

8. Eventually, the Department of Treasury's reclamation claim was satisfied by money supplied by the accused.

■ On essentially the same findings of fact, the trial panel concluded that the accused had violated *former* DR 1-102(A)(4), *former* DR 9-102(A) and *former* DR 9-102(B)(3).

---

[4] The accused produced no records at the hearing to substantiate his claim and testimony that he notified the SSA of O'Keefe's death and attempted to return the money. The accused attached as an exhibit to his reply brief in this court what he represents to be a copy of a letter to the Department of Treasury, in which he writes that he is enclosing his trust account check for $6,000 to repay the O'Keefe post mortem checks. This amount is $558 short of the total amount of the O'Keefe checks. The letter is on the letterhead of Gilley, Busey & Howard. We cannot help but wonder why the letter, which is dated "2/2/84," is in the accused's handwriting instead of being typed as would be the normal case of a formal letter emanating from a law office. At any rate, the purportedly enclosed check was not the vehicle by which any repayment to the SSA was eventually accomplished.

[5] We shall discuss the accused's relationship with Lelia MacQuarrie in connection with the Bar's fourth cause of complaint.

We first consider *former* DR 9-102(A). That rule is concerned with the handling of "funds of clients." The relevant question is whether the funds derived from cashing the SSA post mortem checks were funds of a client of the accused. The accused's client in this matter was not O'Keefe, for she was dead. His client was the personal representative of O'Keefe's estate. The accused was the personal representative. These were neither the personal representative's funds nor funds belonging to O'Keefe's heirs. ORS 114.215. As personal representative, he was charged with managing and preserving O'Keefe's estate. ORS 114.265. The Bar's amended complaint alleges that the estate "had no claim of right to those funds" and further alleges that they were the "government's funds." The government was certainly not the accused's client. Quite simply, *former* DR 9-102(A) is not applicable. We conclude that the accused did not violate this rule.

*Former* DR 9-102(B)(3) is also concerned with "funds" and other properties "of a client" coming into the lawyer's possession. For the same reasons advanced above, this rule is not applicable and therefore was not violated.[6]

Under the first cause, therefore, there remains the question whether the accused, by depositing the funds from these SSA checks and using them for his own purposes, engaged in conduct involving dishonesty, fraud, deceit or misrepresentation in violation of *former* DR 1-102(A)(4). The Bar relies on cases in which we have held that depositing a client's funds in a lawyer's personal bank account constitutes conversion and that converting money involves dishonesty. Those cases are factually inapposite because these funds were not those of a client.

What the Bar has proven is that the accused, without any authorization, endorsed the SSA checks and used the funds thus derived for his own purposes. This was a conversion of government funds as alleged in the amended complaint. We hold that this conversion was within the meaning of the term "dishonesty" as used in *former* DR 1-102(A)(4).

---

[6] Although the Bar proved that the partnership contract of Gilley, Busey & Howard obligated the accused to keep clients' funds in the firm's trust account, that is immaterial, for these were not a client's funds.

Assuming, *arguendo,* that the accused was not acting in his capacity as lawyer, nevertheless, he violated the disciplinary rule, and it is not necessary for the purpose of disciplinary proceedings that he be acting in his capacity as lawyer. *See, e.g., In re Holman,* 297 Or 36, 57, 682 P2d 243 (1984), *In re Kenneth W. Stodd,* 279 Or 565, 568 P2d 665 (1977), and *In re Warner W. Gregg,* 252 Or 174, 446 P2d 123, 448 P2d 547 (1968).

## SECOND CAUSE

The amended complaint alleges the following. One Frederick died in May 1974. Her son, Petersen, was named personal representative of her estate, and the accused undertook to probate the estate. The accused agreed to act as collection agent for the sale of a piece of real property that the decedent had owned. The property was sold on contract, and the accused was to collect and disburse the funds received from the purchasers. One DeRoy eventually became the purchaser of the property and made payments to the accused. The accused received payments from DeRoy from November 1975 to December 1984. During that period of time, the accused did not maintain complete records of these funds, nor did he render to the heirs, the court or Petersen an accounting of the payments until Petersen demanded that he do so in December 1984. The accounting then rendered by the accused was incomplete and inaccurate. He deposited the funds received from DeRoy in his own commercial bank account and used funds received from DeRoy for his own purposes without authorization. Although he had undertaken to pay the real property taxes from the contract payments, he failed to do so as they became due for the tax years 1981-82 through 1984-85 and did not pay them until confronted by Petersen on December 26, 1984. The amended complaint alleges that this conduct violated *former* DR 1-102(A)(4), *former* DR 6-101(A)(3), *former* DR 9-102(A) and *former* DR 9-102(B)(3) and (4).[7]

---

[7] *Former* DR 6-101(A)(3), which is now substantially DR 6-101(B), provided:

"A lawyer shall not:

"* * * * *

"(3) Neglect a legal matter entrusted to him."

The accused answered that he did undertake to probate the estate, that the property was sold on contract and that he agreed to act as collection agent and to disburse the funds that he received from the purchasers. He admits that DeRoy made payments to him. He affirmatively alleged that the heirs of Frederick could not agree among themselves that the funds were not to be disbursed to Petersen or anyone else until various claims and counterclaims among the heirs could be resolved. He further alleged that complete records were kept but that they were inadvertently destroyed. He alleged that the heirs agreed that he was to keep the funds invested and that payment of taxes was to be delayed to maximize return on the investment. He alleged that all funds were to remain invested until the heirs could agree as to how the funds were to be distributed. He further alleged that at all times the funds were available for immediate disbursement to the heirs. He alleged that after he met with Petersen in December 1984, receipts and disbursements were reconciled and Petersen was paid the amount he claimed was owing.

On our *de novo* review, ORS 9.536(3), we find the following facts have been established by clear and convincing evidence.

1. Frederick died in 1974. Petersen was appointed personal representative. The accused undertook to act as attorney for the personal representative and undertook probate of the estate.

2. The principal asset of the estate was a parcel of real property that was sold on contract with DeRoy eventually becoming the purchaser. DeRoy made all payments at the rate of $140 per month as required by the contract.

3. Petersen was in the armed forces, and it was difficult, if not impossible, for the accused to communicate with Petersen for lengthy periods of time between 1976 and December 1984. Several unsuccessful attempts were made by both the accused and the probate court to do so.

4. By appointment, Petersen went to the accused's office on December 24, 1984, and discharged the accused as attorney and demanded all paperwork and funds relating to the estate. The accused told Petersen that he had no paperwork save two ledgers because all other paperwork had been

lost when he resigned from the firm of Gilley, Busey & Howard and moved his office. The accused did present Petersen with two handwritten ledgers that the accused represented to be an accounting of the proceeds of the real property sale contract and of the funds due the heirs of Frederick.

5. Petersen compared the ledgers and found them to be inconsistent with each other with respect to some 22 monthly payments that the ledgers showed to have been missed by DeRoy. While examining the ledgers, Petersen observed that they were all in the same ink, although they purported to cover a period of about eight years. He suspected that all entries had been prepared at the same time.

6. Petersen asked the accused why he had not done something about the failure of DeRoy to make payments. The accused replied that he was just "trying to protect the estate."

7. Petersen asked whether the taxes had been paid, and the accused answered that they had been paid in a timely manner.

8. One of the ledgers showed that the heirs were owed $4,799.28 from funds received by the accused. Petersen demanded this money, and the accused gave Petersen a check for $4,800, stating that this was close enough.

9. Petersen left the accused's office and went to see DeRoy. She showed him cancelled checks, cashed by the accused, for every payment that was required under the contract and gave Petersen copies of the cancelled checks.

10. Eventually, all the proceeds from the checks that the accused claimed were not received found their way into the accused's personal bank accounts.

11. Petersen went to the county courthouse and found that small amounts had been paid on taxes for the property over the years but that a lump sum payment had been made to clear the account balance on December 24, 1984, the day that Petersen had confronted the accused.

12. Petersen returned unannounced to the accused's office on December 27, 1984, and asked the accused why he had lied about payment of the taxes. The accused replied that he had the money invested and did not wish to draw it out.

13. Petersen confronted the accused with the proof that DeRoy had made all contract payments, and the accused gave Petersen another check for $4,700 on this account. That amount does not match the claimed discrepancy in principal.[8]

14. The accounts in which the accused deposited the funds from the DeRoy checks were often depleted to the extent that they were insufficient to cover checks written by the accused in relatively small amounts.

As to the accused's affirmative allegations, we find that he has offered no credible evidence that he was authorized to invest the funds received from DeRoy for the benefit of the heirs of Frederick or that he made any such investments; rather, he used the money for his own purposes. Funds were not immediately available for disbursement to the heirs.

■ The trial panel concluded that the accused violated *former* DR 1-102(A)(4) by giving to Petersen ledgers that the accused knew to be false and attempting to pay Petersen an amount as payment in full when the accused knew that he owed almost double that amount. We agree that this conduct of the accused involved dishonesty and misrepresentation in violation of that rule.

■■ The trial panel found that the accused had violated *former* DR 9-102(A) by "depositing funds made payable to the estate into his personal" bank account. The trial panel found that the accused had violated *former* DR 9-102(B)(3) by failing to maintain complete and accurate records of the "funds coming into and going out of the" Frederick estate. These disciplinary rules prohibit a lawyer from commingling "funds of clients" with the lawyer's own funds and govern how he is to preserve and safeguard clients' funds and other properties and to account therefor. To establish violation of either rule, it is necessary to prove that the funds or properties were those "of a client." It is arguable that funds and other properties that come into a lawyer's possession or control by reason of the lawyer's representation of a personal representative are funds of a client within the meaning of these disciplinary rules. If they are, the accused here violated these disciplinary rules. It is also arguable that because these funds were the proceeds of

---

[8] Perhaps it was intended to cover principal and interest on the money which had found its way into the accused's personal bank accounts.

real property that devolved to the heirs of Frederick on her death under ORS 114.205 and 114.215, these funds were not the funds of the accused's client, for the accused's client was the personal representative who had no title to those funds. If this is so, the accused did not violate these disciplinary rules.

These arguments were not recognized and were not briefed by either the Bar or the accused. Because we have not had the benefit of adversarial briefing and because it is not necessary to resolve this issue to arrive at a just result in this proceeding, we do not resolve it. Out of an abundance of fairness to the accused, we shall assume, without deciding, that he did not violate *former* DR 9-102(A) and *former* 9-102(B)(3). *But cf. In re Mannis,* 295 Or 594, 668 P2d 1224 (1983).

■ The trial panel found that the accused violated *former* DR 9-102(B)(4) by paying less to Petersen than the accused knew was due Petersen when Petersen demanded full payment. Here, Petersen, *qua* personal representative, was the accused's client. Petersen requested full payment of "funds * * * in the possession of the lawyer," and the accused knowingly failed to make full payment to the client who was entitled to receive the funds so as to carry out his duties to administer the estate. ORS 114.215 and 114.225. We agree that the accused violated *former* DR 9-102(B)(4).

■ The trial panel found that the accused did not violate *former* DR 6-101(A)(3). We disagree. It is clear that the accused neglected a legal matter entrusted to him with respect to probate of the Frederick estate by failing to keep proper records of the receipts and disbursements of funds and failure to pay the taxes as they became due.

## THIRD CAUSE

The original complaint charged that the accused maintained a clients' trust account at FIB from January 1982 to December 1985, that he deposited both clients' funds and his personal funds in the account and paid portions of those funds to himself by cashing checks made payable to cash. The complaint charged that the accused had thereby used his clients' funds for his own purposes without their authorization or consent. This was alleged to be in violation of *former* DR 1-102(A)(4) and *former* DR 9-102(A).

The accused answered that this account was not a clients' trust account although it was "labeled" as such. He alleged that this labeling was to avoid any possible executions and that the account was used with knowledge of his clients for handling his own and clients' investments "with concurrence of and with success for said clients."

The amended complaint substantially charges the same facts except that the account is alleged to have been "a commercial account registered in his own name" rather than a clients' trust account.

The trial panel, on its own motion, dismissed this cause. The panel believed this rather general charge was duplicative of specific charges of misuse of clients' funds embraced in the first, second and fourth causes. The Bar argues that the evidence shows that two checks payable to Lelia MacQuarrie that are not embraced in the fourth cause were deposited in this account and the funds therefrom wrongfully used by the accused.

An understanding of this charge and argument is more easily obtained by turning to the fourth cause.

## FOURTH CAUSE

The amended complaint charges the following. In January 1984, Lelia MacQuarrie's sister, Margaret Stewart, died. MacQuarrie was Stewart's residuary legatee. The lawyer probating the Stewart estate in Pennsylvania informed the accused of various assets to be transferred to MacQuarrie. On April 16, 1984, MacQuarrie signed a power of attorney appointing the accused. On the following day the accused became the trustee of a revocable living trust for MacQuarrie. One of the assets of the Stewart estate was a multiplier time deposit certificate at a Pennsylvania bank for $10,000 face value in the name of Stewart or MacQuarrie. On April 27, 1984, the accused presented the certificate to USNB for collection.

On May 17, 1984, the accused received from USNB a cashier's check for $10,124.95 as proceeds from the time deposit. He deposited the check in his personal savings account at the bank. Prior to that deposit the accused had about $890 in the account. Later that month the accused

transferred $9,848.22 from that account to his personal checking account at USNB. Early in May the checking account had a zero balance. By June 6, 1984, the accused had no money in the checking account, having issued checks for $9,848.22. On that date his savings account had a balance of $1,177.89.

The checks drawn on his personal checking account were $3,300 to his wife, $5,000 to himself, various checks to cash totaling $170, $400 to a psychologist and the rest to various merchants.

The accused deposited client funds in a personal account and paid personal obligations and funds to himself out of that account, thereby using his client's funds for his own purposes without the client's authorization.

He also deposited checks payable to MacQuarrie in the respective amounts of $25,120.97 and $2,980.29 to his commercial account at FIB.

The accused answered these allegations by alleging that "all funds were received and disbursed and properly accounted for, in behalf of said Lelia MacQuarrie." During the hearing he alleged that the funds of MacQuarrie deposited in his personal accounts were gifts from his client. The Bar replied that "any purported gift" was obtained through undue influence and without full disclosure or informed consent with respect to the likelihood that the exercise of the accused's judgment would or reasonably might be affected by his own financial, business, property or personal interests. The accused denied the charges of undue influence and failure to disclose or obtain consent.

The Bar charged that this conduct violated *former* DR 1-102(A)(4), *former* DR 9-102(A) and *former* DR 5-101(A).[9]

---

[9] *Former* DR 5-101(A) provided:

"Except with the consent of his client after full disclosure, a lawyer shall not accept employment if the exercise of his professional judgment on behalf of his client will be or reasonably may be affected by his own financial, business, property, or personal interests."

The rule now requires in addition that to achieve full disclosure the lawyer must recommend that the client seek independent legal advice concerning the lawyer's continued representation of the client.

The accused testified to the following. MacQuarrie had told him that because she was elderly and didn't expect to live long, she didn't need the money for personal purposes and that he could do with the money what he wanted, even to taking it himself if he wanted to do so. She talked to him weekly by telephone or at her apartment. She had trust and confidence in him at the time of giving him the money and still had that trust and confidence despite the Bar proceedings against him. She had given $30,000 to his church, located across the street from her residence, although she was not a member, after he had suggested to her that the church needed money. As to the matter of advising her to seek independent counsel regarding the gifts to him, he testified:

> "It goes back to 1984. She asked — offered to give it to me several occasions, still offers to give it to me. And I don't remember the number of times I said, 'I think you ought to talk to other people, talk to a minister.' You can ask her tomorrow. We talk almost every week. She's elderly. She's lonesome. We talk weekly and we cover lots of subjects.
>
> "* * * * *
>
> "* * * She's an intelligent lady. She's a shrewd lady. She doesn't need my advice, doesn't want it.
>
> "* * * * *
>
> "I talked to her two or three times, and she was emphatic that she doesn't need advice, and I didn't feel obligated to force it down her throat, so whatever you want to say. The Bar is concerned about the people, but people are going to do what they want to do. She offered to give me the whole darned funds, and she told him [Bar representative] on the phone, she did, and she was volunteering it, and I don't know why I have to keep telling her she needs advice. She's clear minded."

He further testified that the subject "always comes up" in his conversations with her. She would say:

> " 'Why don't I give you the money. I don't need it. I'm not going to be here.' And in response to that I said, 'I have some investment needs,' and that's the way it came about. I did not continually repeat for her to get advice from another attorney. I thought, she has her own investment adviser, I'm sure, and she doesn't need my advice nor does she want it.
>
> "* * * * *
>
> "I think I said there were more funds available that were

on hand. And she said, 'I'd like you to have all of it. I don't want to bother with it.'

"I said 'I have some needs for it.'

"And she said, 'It would be a pleasure to have you have it.'"

Lelia MacQuarrie was called as a witness by the accused and testified by telephone to the following. She was 86 years old (84 at the time involved in the complaint). She had known the accused since 1957. Her sister died in January 1984. In April or May she saw the accused and told him that she didn't want the money from her sister's estate and

"I asked him — I hope he remembers — to please give it away or take it. I didn't think I would live for two years. I thought, well, I won't be here long enough, and I didn't really want it. I said I would like — I did want to leave some for a memorial for her. She's an Episcopalian and I wasn't. And so he named a name off, and I said 'Fine, send it to Trinity Church.' It's in my neighborhood. And if my sister would have been a Catholic, I would have had him send it over to the cathedral. And I said to him — I didn't say, 'Get rid of the money.' Sometimes I say that about things because I've been getting rid of things for seven years. I said — I didn't use the words 'get rid of it,' but I said, 'Give the money away or do what you want to do with it' because I — at the time I certainly didn't think that I would be here two years and, darn it, I'm still here."

She testified that she gave the accused about $39,000. She stated, "[W]hat was wrong with that? It was my money. I'm giving it to you." On questioning by the accused, she further testified:

"Q. You and I met in May of 1967, I believe. It's not crucial.

"Miss MacQuarrie, the Bar had alleged in regard to the money you gave me in May and June 1984 that I — that I got through undue influence on you —

"A. Oh, no. Heavenly days. I don't think so, no.

"Q. — without full disclosure or informed consent with respect to the likelihood that I exercise [sic] professional judgment would have or reasonably might be affected by my own financial business or property or personal interests. Would you agree with that allegation?

"A. Oh, heavenly days. I don't understand it. I hate to ask you to repeat it.

"Q. Well, It's quite long and lots of legalese. In other words, that I had a conflict with you in regard to obtaining your consent or you giving me the money.

"A. No. I wish that you had taken the whole thing.

"MR. HOWARD: That's all I have.

"THE WITNESS: That's the truth, that's all I can say. I didn't want it. I didn't think I would be here. I had enough of my own."

The trial panel found:

"In the matter of Lelia MacQuarrie we find that MacQuarrie gave the accused gifts in the amount of $38,226.21 knowingly, and with informed consent."

(This sum included the amounts involved in the Bar's third cause of complaint.)

In its brief to us, the Bar argues that we should find that the amounts involved in the third and fourth causes were not gifts at all or that, if they were, they were procured by undue influence.

The Bar points out that the accused did not, prior to the hearing before the trial panel, claim that these funds were gifts. In his original answer, he alleged only that "all funds were received and disbursed and properly accounted for, in behalf of said Lelia MacQuarrie." They argue that the claim of gift is an "after-the-fact fabrication." The Bar argues that this is similar to the fabrication of the lawyer in *In re Anson,* 302 Or 446, 730 P2d 1229 (1986), that money from an elderly widow was a gift rather than a conversion of her funds. In *Anson* we pointed out that there was nothing in the previous relationship between Anson and the widow that would indicate that she would favor him with such a gift. There is evidence in this case, on the other hand, of the long-term, friendly relationship between the accused and MacQuarrie. In *Anson* the widow had likely beneficiaries (lineal descendants) to whom her money would go. MacQuarrie has none. In *Anson,* when the widow found that Anson had taken her money, she immediately accused him of theft. Here, MacQuarrie swore that she gave the money to the accused. We find that the money was a gift from MacQuarrie to the accused. That being so, the accused's use of the money did not violate *former* DR 9-102(A).

This leads us to consideration of whether the gift was procured by undue influence. If it was, argues the Bar, *former* DR 5-101(A) was violated. The text of that rule does not so state, but the Bar relies on Ethical Consideration 5-5, which provides:

> "A lawyer should not suggest to his client that a gift be made to himself or for his benefit. If a lawyer accepts a gift from his client, he is peculiarly susceptible to the charge that he unduly influenced or over-reached the client. If a client voluntarily offers to make a gift to his lawyer, the lawyer may accept the gift, but before doing so, he should urge that his client secure disinterested advice from an independent, competent person who is cognizant of all the circumstances."

We have held that the Ethical Considerations are of aid to us in interpretation of the Disciplinary Rules. *See, e.g., In re Moore,* 299 Or 496, 507, 703 P2d 961 (1985).

*Former* DR 5-101(A) was a rule prohibiting the acceptance and continuation of employment in certain circumstances. Even as fleshed out by resort to the Ethical Considerations, the rule just does not fit the real thrust of the Bar's amended complaint. The real thrust is a wrongful taking of the client's funds, not the acceptance or continuation of employment. We conclude that DR 5-101(A) was not violated by the accused's conduct.

There is still the charge that the taking of funds by means of undue influence violated *former* DR 1-102(A)(4).

■■ The relationship between lawyer and client is one of special trust and confidence. When dealing with a client, the conduct of a lawyer must be characterized by fairness, honesty and good faith. *Toomey v. Moore,* 213 Or 422, 430, 325 P2d 805 (1958); *In re Lobb's Will,* 177 Or 162, 189, 160 P2d 295 (1945); *Kirchoff v. Bernstein,* 92 Or 378, 387, 181 P 746 (1919). A donee who occupies a confidential or fiduciary relationship to the donor and who participates in the consummation of a gift has a duty to see that the donor gets independent advice, and this is especially so where the donee is a lawyer representing the donor. *Toomey v. Moore, supra; In re Lobb's Will, supra.*

■ In *Penn v. Barrett,* 273 Or 471, 476-480, 541 P2d 1282 (1975), this court identified seven factors that suggest the use

of undue influence. *See also In re Reddaway's Estate,* 214 Or 410, 419-20, 329 P2d 886 (1958). Those factors are: (1) participation in arrangements for the gift; (2) lack of independent advice, which is of particular importance when the donee is the donor's lawyer; (3) secrecy and haste; (4) change in the donor's attitude toward others; (5) change in the donor's plan of disposing of property; (6) unjust and unnatural gift; and (7) the donor's susceptibility to influence.

We find the following to have been established by clear and convincing evidence. The accused had been Mac-Quarrie's lawyer since 1967. Over the period of time from 1967 to 1984, he became her friend and confidant, and they visited almost weekly. In addition to being her lawyer, the accused became trustee of her living trust, and she gave him general power of attorney to deal with her property.

The accused handled all contacts with the lawyer probating Stewart's estate in Pennsylvania. The accused received the certificate and checks from that estate. He deposited the funds thereby derived into his personal account without any discussion between himself and MacQuarrie about those particular funds being gifts to him. He "participated in arrangements for the gifts," indeed, he was the sole arranger. He enjoyed with her a fiduciary and confidential relationship. He did not see that she got independent legal or financial advice concerning the gifts that she made to him. She had no such advice.

The accused never prepared any documentation of these gifts, and there was no other documentation. No one else was privy to the conversations in which she told the accused to take her money if he wanted to do so. There was nothing but secrecy here.

As to the other factors identified in *Penn v. Barrett, supra,* the gifts marked a change in MacQuarrie's property disposal plans. She had created a trust in April 1984. The accused was not among the several beneficiaries named therein although the trust appears to have been an attempt to provide for natural objects of her bounty. In less than three months from the time the trust was established, she made three substantial gifts to the accused that depleted the funds available to carry out the purposes of the trust.

MacQuarrie was very susceptible to the accused's influence by reason of her age, her health and their long-term relationship. She trusted him completely.

The gifts were obtained by the undue influence of the accused over MacQuarrie, and this conduct was a violation of *former* DR 1-102(A)(4) in that this conduct was dishonest.

### SIXTH CAUSE[10]

■ In this cause the Bar charged the following. Complaints about the conduct of the accused were received from the United States Attorney's office (first cause) and from Petersen (second cause) in late 1984 and early 1985. These complaints were referred to the Local Professional Responsibility Committee (LPRC) for investigation. LPRC subpoenaed the accused to attempt to obtain information about the complaints. The accused defied the subpoena. The Bar applied to the Multnomah County Circuit Court pursuant to ORS 9.532(3). The court ordered the accused to appear at a time certain before LPRC's designated investigator. The accused did not appear. The circuit court found the accused in contempt for this conduct. Without claim of applicable right or privilege, the accused sought to delay the explanations of the complained-of conduct for as long as possible. The Bar alleges that this conduct violated *former* DR 1-103(C).[11]

The Bar adduced ample evidence to show the truth of these charges. The accused testified that the Bar would not cooperate with him so as to enable him to have his out-of-state lawyer and other witnesses present when he talked to the LPRC's investigator. He swore that he was always ready, willing and able to meet with the investigator on those terms.

Nothing is to be gained by detailing the many times on which the accused failed to keep appointments with

---

[10] The fifth cause was withdrawn by the Bar at the commencement of the hearing before the trial panel; therefore, no evidence to support the charge was introduced.

[11] *Former* DR 1-103(C), which is much the same as present DR 1-103(C), provided:

> "A lawyer who is the subject of a disciplinary investigation shall respond fully and truthfully to inquiries from and comply with reasonable requests of the general counsel, the local professional responsibility committees, the state professional responsibility board, and the board of governors as requested, subject only to the exercise of any applicable right or privilege."

LPRC's investigator and offered lame excuses for failure to appear. We agree with the trial panel's finding:

"The record shows a consistent pattern of evasive behavior with regard to the investigation. Each request for a meeting was followed by the accused's plea for additional time to prepare. The effect was to postpone action for almost eleven months. In the final analysis the accused never did respond to the Bar's inquiry for information."

This, taken together with the accused's refusal to obey subpoenas leading to his conviction for contempt of court in this respect, leads us to the conclusion that the accused did violate *former* DR 1-103(C).

## SANCTION

The accused produced testimony of himself and family members that he was under stress and depressed during the time in question. He produced evidence from his treating psychiatrist to the same effect. The doctor testified that with several months treatment the accused could probably return to the practice of law without risk to his clients and to the public. The doctor testified that the accused was mentally competent during the time of the complained-of conduct. The accused does not contend to the contrary.

We have found disciplinary rule violations that demonstrate that this accused has misappropriated government funds and funds belonging to the heirs of a decedent. He has lied to his client about his handling of the funds of those heirs. He has neglected a legal matter entrusted to him. He has procured large sums of money from a client by the exercise of undue influence. He has failed to cooperate with the Bar and the LPRC in the investigation of charges arising out of his misconduct.

In several recent disciplinary cases we have considered appropriate sanctions by reference to aggravation and mitigation factors identified by the American Bar Association standards approved in February 1986. The standards state:

9.21 "Definition. Aggravation or aggravating circumstances are any considerations, or factors that may justify an increase in the degree of discipline to be imposed."

9.22 "Factors which may be considered in aggravation.

"Aggravating factors include:

"(a) prior disciplinary offenses;

"(b) dishonest or selfish motive;

"(c) a pattern of misconduct;

"(d) multiple offenses;

"(e) bad faith obstruction of the disciplinary proceeding by intentionally failing to comply with rules or orders of the disciplinary agency;

"(f) submission of false evidence, false statements, or other deceptive practices during the disciplinary process;

"(g) refusal to acknowledge wrongful nature of conduct;

"(h) vulnerability of victim;

"(i) substantial experience in the practice of law;

"(j) indifference to making restitution."

9.31 "Definition. Mitigation or mitigating circumstances are any considerations or factors that may justify a reduction in the degree of discipline to be imposed."

9.32 "Factors which may be considered in mitigation.

"Mitigating factors include:

"(a) absence of a prior disciplinary record;

"(b) absence of a dishonest or selfish motive;

"(c) personal or emotional problems;

"(d) timely good faith effort to make restitution or to rectify consequences of misconduct;

"(e) full and free disclosure to disciplinary board or cooperative attitude toward proceedings;

"(f) inexperience in the practice of law;

"(g) character or reputation;

"(h) physical or mental disability or impairment;

"(i) delay in disciplinary proceedings;

"(j) interim rehabilitation;

"(k) imposition of other penalties or sanctions;

"(l) remorse;

"(m) remoteness of prior offenses."

We shall consider the factors in the order set forth in section 9.22.

(a) The accused has a prior disciplinary offense. *See In re Howard,* 297 Or 174, 681 P2d 775 (1984), where the accused was disciplined for having committed the crime of prostitution by exchanging legal services for sexual favors.

(b) The conduct of which we have found him guilty is, for the most part, dishonest conduct.

(c) There is a clear pattern of misconduct. He misappropriated government funds (the SSA checks) on 11 separate occasions and funds belonging to the heirs of Frederick on some 22 occasions.

(d) There have been multiple offenses.

(e) This is as clear a case of bad faith obstruction of the disciplinary proceedings by intention as has come to the attention of the court during the experience of every present member of the court.

(f) The accused gave testimony that we have obviously found to be false during this disciplinary process. We believe the submission of the purported copy of a letter to which we referred in note 4, *supra,* is a deceptive practice during this disciplinary process.

(g) The accused has not forthrightly acknowledged at any time the wrongfulness of his conduct. He has conceded that he has exercised bad judgment.

(h) His victims were the United States government, the heirs of Frederick and his friend and client, MacQuarrie. In the circumstances that we have found to exist in this case, they were all vulnerable.

(i) The accused has been admitted to the practice of law since 1959 and has had a broad experience in the practice.

(j) The accused has made restitution when forced

to do so with respect to the government and the Frederick heirs. It appears that MacQuarrie does not desire restitution, and the record does not show that any has been made.

As to the mitigating factors in section 9.32 of the standards, we find:

(a) There is not an absence of a prior disciplinary record.

(b) There is not an absence of a dishonest or selfish motive.

(c) The accused has some personal and emotional problems, for which he has sought treatment.

(d) There is an absence of *timely* good faith effort to make restitution.

(e) There was no full and free disclosure to the Bar and LPRC; there was no cooperative attitude toward the proceedings.

(f) There was no inexperience in the practice of law.

(g) The accused has enjoyed an exemplary reputation as an honest and reputable lawyer within the legal community, both of bench and of bar. He has been elected by his fellow lawyers to various Multnomah Bar Association offices, including that of president. He has also devoted much service to the community outside the legal profession.

(h) While his emotional problems and marital difficulties did not render him incompetent, they did have some impact on his ability to maintain the high standards expected of a member of the profession.

(i) The only delay in these proceedings may be laid to the stonewalling of the accused.

(j) There has been some interim rehabilitation in that the accused has realized his need for psychiatric care, and the psychiatrist has found some improvement in the accused's ability to deal with his problems.

(k) There have been no other penalties or sanctions imposed with respect to these matters except that this

court suspended him from practice pending resolution of these charges.

(l) There is little remorse on the part of the accused.

(m) Although the prostitution matter is not remote in time, it is remote in character.

Having considered these factors and the discipline imposed in similar cases, we conclude that the conduct of the accused warrants disbarment. In our opinion, disbarment is fully warranted without consideration of the charges concerning the accused's conduct with respect to MacQuarrie. Leaving those charges completely aside, we find it clear that the accused misappropriated the money of others more than 30 times and made restitution only when confronted by the representatives of those others. The failure to cooperate in the investigation of the complaints against him simply adds to the side of the scale for disbarment rather than suspension.

The accused is disbarred, and the Oregon State Bar shall have judgment against him for its actual and necessary costs and disbursements incurred herein. ORS 9.536(4).

**PETERSON, C. J.,** concurring.

I concur with the majority, with this exception.

Concerning the charge that the accused violated *former* DR 9-102(A) by "depositing funds made payable to the [Frederick] estate into his personal" bank account, the majority opinion states that it is arguable that the rule was violated and that it is arguable that it was not. Because the "arguments were not recognized and were not briefed by either the Bar or the accused," the majority does not decide this question. 304 Or at 203-4.

Respecting the Frederick estate, the Trial Panel found that the accused violated *former* DR 9-102(A). The Bar argues here that the accused was guilty of violating the rule. True, the specific question raised by the majority was not argued. The question properly is before us and I would decide it.

*Former* DR 9-102(A) provided that "[a]ll funds of clients paid to a lawyer * * * shall be deposited in one or more

identifiable trust accounts * * *." I would find that the estate funds that the accused deposited in his personal account were funds of a client, and therefore would find the accused guilty of violating *former* DR 9-102(A).

One obvious purpose of mandating the "separation of funds of a client from those of a lawyer [is] to protect the client." EC 9-5. In interpreting the phrase "funds of client" consistent with this purpose, we should construe the phrase consistent with the goal the rule seeks to attain — separation of the lawyer's personal or business funds from funds received from clients.

A lawyer has an obligation to his or her client to avoid the commingling of funds whether the client owns the property or is otherwise responsible (and potentially liable) for it — that is, whenever the avoidance of commingling would "protect the client." We should interpret DR 9-102(A) as identifying an interest of the client that would be adversely affected or threatened by the lawyer's commingling of the lawyer's funds with funds that the lawyer possesses on behalf of, or for the client. *Cf.* ABA Model Rule 1.15(a) ("A lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property.").

Other states have disciplined lawyers for commingling the funds of an estate with the lawyer's own funds where the lawyer's client was the personal representative of the estate. The opinions do not specifically discuss whether the funds of the estate are "funds of a client," but the holdings are clear. *See, e.g., In re Moore,* 110 Ariz 312, 518 P2d 562 (1974) (accused acting as executor and lawyer for estate, court "had no hesitancy in ordering disbarment" when commingling was "accompanied by a conversion of the client's funds"); *Matter of Reed,* 369 A2d 686 (Del Supr 1977) (accused represented estate administrator, accused's failure to maintain and preserve funds of estate by disbursing to other clients amounts held on behalf of the estate was a violation of DR 9-102 and warranted censure and fine); *Disciplinary Bd of Hawaii Supreme Court v. Kim,* 59 Hawaii 449, 583 P2d 333 (1978) (accused represented estate administrator and made personal use of estate's funds; "wrongful misappropriation of the funds of a client" warranted disbarment); *Matter of Cochran,* 270

Ind 15, 383 NE2d 54 (1978) (accused acting as administrator and lawyer for estate; violations, including failure to segregate assets of estate and use of such assets, warranted disbarment); *State ex rel. NSBA v. Miller,* 225 Neb 261, 404 NW2d 40 (1987) (lawyer represented personal representative and commingled and made personal use of estate's funds; court held that such use of "client's" funds usually warranted disbarment, circumstances warranted two-year suspension).

The Oregon probate code also supports this conclusion notwithstanding ORS 114.215(1), which provides that "[u]pon the death of a decedent, title to the property of the decedent vests [in the heirs or devisees] subject to * * * rights of creditors, * * * administration and sale by the personal representative." Even though title to real and personal property "vests" in the heirs or devisees upon the decedent's death, the personal representative has these duties and responsibilities respecting that property:

— "has a right to and shall take possession and control over the estate." ORS 114.225

— "is a fiduciary who is under a general duty to and shall collect the income from property of the estate." ORS 114.265

— is authorized to "retain assets," "receive assets," "deposit funds * * * in bank * * * accounts" and do a host of other things. ORS 114.305.

— "has power to sell, mortgage, lease or otherwise deal with property of the estate." ORS 114.325(1)

The personal representative is not the *owner* of the property of the estate. But the personal representative — solely — holds, possesses, retains, preserves and controls the property of the estate. Only the personal representative has the right to "collect the income from property of the estate." Petersen could have put the income in a bank account in his name. He permitted the accused as his attorney to collect the income. Petersen, the accused's client, entrusted the accused with the money. Only Petersen had the right to demand from the accused the proceeds of the sale of the real property. Those funds were, in the sense of *former* DR 9-102(A), the funds of the personal representative until the estate was distributed.

When the accused received the contract payments, he was accountable to the personal representative for the money. Even though the personal representative was not the legal owner of the property, his rights and responsibilities respecting those assets were considerable. The funds the accused received were funds of a client — Petersen — under *former* DR 9-102(A).