Argued and submitted September 5, 1995, accused is disbarred February 8,
reconsideration denied April 2, 1996

In re Complaint as to the Conduct of

## HOWARD G. BINNS,
*Accused.*

(OSB 91-79; SC S42046)

910 P2d 382

Charles P. Denkers, Portland, argued the cause and filed the brief for the accused.

Mary A. Cooper, Lake Oswego, argued the cause for the Oregon State Bar. With her on the brief was John L. Klor, Portland.

PER CURIAM

## PER CURIAM

The Oregon State Bar (Bar) charges the accused with numerous instances of professional misconduct involving dishonesty. The case turns on the credibility of the accused's explanations of his conduct. Review by this court is on the record, *de novo*. BR 10.6; ORS 9.536(3).

The Bar alleges that the accused committed three distinct acts of dishonesty: (1) He lied to his clients when he told them that another lawyer had requested $2,500 for work involved in obtaining a new automobile for the clients and that $2,500 was a reasonable value for that work. (2) He lied to the Bar's investigators when he told them that the clients had instructed the accused to pay the other lawyer, over the accused's objections, the sum of $2,500 for work related to acquiring the automobile. (3) He lied when he supplied documents to the Bar containing statements that the accused knew to be untrue to the effect that his clients instructed him to pay the other lawyer $2,500 in relation to an automobile purchase.

### FACTS

We find the following facts to be proved by clear and convincing evidence. The accused represented Mr. and Mrs. Hope (clients), who had sustained serious injuries in an automobile accident. After negotiating a settlement of one of the clients' claims and before the settlement was paid, the accused left on a three-week vacation. Before leaving on vacation, the accused arranged for Klemp, another lawyer who shared office space with the accused as the accused's tenant, to handle matters that might come up concerning the settlement and to deal with these and other clients while the accused was away. The accused told his clients that they would be charged no fee for Klemp's work on the settlement and that the accused would pay Klemp's charges for that work out of the accused's percentage share of the settlement proceeds. Klemp spent between five and six hours covering for the accused while he was on vacation.

The clients wished to purchase a new automobile out of their share of the settlement proceeds and to do so before the money was in hand. Klemp suggested that the clients assign some of their share of the settlement proceeds to the automobile dealership. The automobile dealer agreed

to this proposal. Klemp drew up a simple assignment. On the strength of that assignment, the dealer delivered a new automobile to the clients. Later, detailed accounting by Klemp of the time spent on the automobile transaction showed one and one-half hours expended on that effort.

The settlement funds were paid and placed in the accused's lawyer trust account. When he returned from vacation thereafter, the accused wrote checks on the lawyer trust account to pay various bills and disbursements related to the clients. One check was written to Klemp for $2,500. The accused directed the office secretary, Mary Smith, to sign that check. The accused signed the rest of the checks, including a $25,000 check to himself. The $2,500 check to Klemp was deducted from the *clients'* share of the settlement, not from the contingent percentage share of the settlement due to the accused. Later, the accused mailed a written statement to the clients showing how he had disbursed their funds, including the $2,500 that he had paid to Klemp.

When the clients learned that the accused had paid Klemp $2,500 of their money for, as they saw it, very little work, they objected to the accused. The clients testified, and we find, that they did not authorize payment to Klemp. When the clients' objection was not resolved, they complained to the Bar. When the Bar inquired of the accused, he said that the clients had *not* objected to Klemp's payment and that he had paid Klemp $2,500 on their specific authority and direction. The accused signed a written Answer to the Bar's formal complaint. That Answer alleges that the clients

> "directed the Accused to pay $2,500 to Randall Klemp for services the [clients] represented Randall Klemp had performed on their behalf * * *. The accused reasonably relied upon the representations [when paying Klemp]."

At the time that the accused told the Bar that his clients had not objected and had specifically directed the $2,500 payment to Klemp, and at the time that he filed the Answer containing the above allegations, the accused did not know that his clients had tape-recorded a relevant telephone conversation with the accused. That conversation was recorded after the time that the accused claims the clients specifically directed him to pay $2,500 to Klemp, after he had

disbursed that sum to Klemp from the clients' funds, and after the accused gave the clients the written statement of how he had disbursed their money. That recording is discussed below.

The accused admits that all funds belonged to the clients and that he made the disbursements. The accused further admits that he did not refund to the clients the amount that he disbursed to Klemp or place that amount in trust pending resolution of the dispute with his clients.

In this proceeding, the accused asserts that:

(1) He was authorized to disburse funds from the settlement money for services provided to his clients.

(2) In arranging the automobile purchase, Klemp provided services independent of and separate from the work specifically entrusted to Klemp.

(3) The accused believed that he was authorized to disburse payment from the lawyer trust account for the other services provided by Klemp.

The accused also asserts that it was the truth when he told the Bar's investigators that his clients specifically instructed him to pay Klemp $2,500 in relation to the automobile purchase. He supported this assertion by providing the Bar, sometime after the Bar started investigating this matter, an affidavit signed by Mary Smith stating that she had attended a meeting among the accused, the clients, and a third party, about a year and a half earlier, where the clients so instructed the accused. As reported above, the clients testified that no such instruction was ever given. The third party was not called as a witness. As discussed below, the affidavit is not persuasive.

## CREDIBILITY

■ Because we review disciplinary cases *de novo*, it sometimes becomes necessary for us to determine the credibility of witnesses. In this case, our task is made somewhat easier, because we do not need to deal with the potential vagaries of memory or perceptions of one witness attempting to convey what another witness said at an earlier time and place.

In the present case there is no question about what the accused said to his clients concerning the "fee" that the accused paid to Klemp out of the money in the accused's lawyer trust account that belonged to the clients. The accused's statements to his clients are on a tape, recorded after the meeting reported in the affidavit. The content of the statements in relation to the $2,500 paid to Klemp, with some important passages emphasized, follows:

"SPEAKER 1 [clients]: *Okay. There's one other thing we have to iron out. That $2500 that went to Randall.* You and I discussed that night that *Randall was supposed to get 10 percent — [out of] your end of it.*

"SPEAKER 2 [the accused]: *Yeah. That went towards his work with the car.*

"SPEAKER 1: *All right.*

"SPEAKER 2: *That's a claim he had on the car. Now, if we want to renegotiate that, that's fine. But that had nothing to do with our contract, with the purpose of that.*

"SPEAKER 1: Sure. But $2500. I don't even mind paying the man, you know, $150 an hour, $200 an hour.

"SPEAKER 2: *No. That's not the — it's not an hourly rate. That was just a fee charged for the services provided in getting you a [car].* * * *

"SPEAKER 1: Nobody discussed prices. I mean, that wasn't — even in the beginning of the deal, I had absolutely no idea that, you know, that was —

"SPEAKER 2: We talked prices as far as my particular deal. And I told you that anybody that I hired to accomplish my job would come out of my fee.

"SPEAKER 1: Sure.

"SPEAKER 2: Now, what he did was way beyond what he was hired by me to do and apparently was with your authority.

"SPEAKER 1: Sure. I didn't realize it was $2,500, because that —

"SPEAKER 2: You're talking about him getting a $25,000 benefit. [Expletive deleted] *he's exposed* at least to that tune, for $25,000, if not way more *for jeopardizing your recovery that I had going.* And that's why I'm so furious with him.

"SPEAKER 1: All right. Do I need to take this 25 up with him?

"SPEAKER 2:   I'll take it up with him. The bottom line, there's probably nothing we're going to be able to do about it without suing him until at least the next go-around with moneys coming in from the recoveries. I think that's the best way to recoup that. But the bottom line is he provided services that could be protected, you know. But my problem with it all is that it wasn't part of my game plan, and that's why you saw me so mad.

"SPEAKER 1:   Okay. Well, I had — I mean, you know, Melvin Beli [sic] doesn't go to work for this.

"SPEAKER 2:   Oh, [expletive deleted], that's wrong. You're crazy. Go shop around. What you asked him to do was easily a $2,500 charge. * * *

"* * * * *

"SPEAKER 1:   Okay. Because this is something that is totally a shock to my wife and I. I don't mind paying Randall [Klemp] for his time and stuff, but I don't feel that I want to — you know, *I don't want to be ripped off*, I mean, as far as that goes.

"SPEAKER 2:   Well, that's not —

"SPEAKER 1:   That's the way she and I feel.

"SPEAKER 2:   Yeah. I know that's the way it looks and feels, but that is a totally legitimate fee amount for what he did, in my opinion. Now, I'd probably go talk to somebody else about it. What sticks in my mind is whether it was an authorized action on his part. It clearly wasn't authorized by me for him to go do this. It was beyond the scope of what I wanted him to do.

"SPEAKER 1:   But the bill was not discussed. He never brought up the deal. He made it such that it was something that was easy, that it didn't take a lot to do.

"SPEAKER 2:   It is easy. It doesn't take a lot to do. *The fact is he knows how to do it and nobody else does. That's what you're paying for is his expertise. Not so much how long it took him to do it, but whether or not he could do it.*

"SPEAKER 1:   Well, I wish he would have turned —

"SPEAKER 2:   You sure as hell couldn't have done it. I couldn't have done it. I don't know very many people that could have done that, and he did it, and that's why he charges that.

"SPEAKER 1:   I just wish he would have brought the price into it in advance, if that's the case.

"SPEAKER 2: I know. That's the number one problem attorneys have is they don't talk frankly about fees, about what they are trying to do.

"SPEAKER 1: Yeah. I mean, you know, you understand where I'm coming from?

"SPEAKER 2: I understand completely where you're coming from. I knew that this would most likely end up this way sooner or later. And frankly I was [expletive deleted]. I was [expletive deleted] at you and I was [expletive deleted] at him and everybody that did this [expletive deleted] when I was out of town.

"SPEAKER 1: I had no idea. I had no idea.

"SPEAKER 2: At least if nothing else, at least out of the next check I would — if I can't get him to backtrack, I will off of my next fee. All right?

"SPEAKER 1: All right.

"SPEAKER 2: — Voluntarily. But I — [End of Tape]"
(Emphasis added.)

Based on the tape, this court finds that the accused intentionally lied to his clients about the reasonableness of the amount of the clients' funds that the accused paid to Klemp and about the degree of expertise that Klemp's performance required to write a one-page assignment and arrange for its acceptance. In support of the proposition that the $2,500 paid out of their funds was a reasonable and justified amount, the accused told the clients that Klemp "knows how to do it and nobody else does." The accused knew that that statement was not true.

It is noteworthy that the accused did not claim, when confronted by the dissatisfied clients, that the clients had told him to pay Klemp $2,500 out of the clients' funds in the accused's lawyer trust account. That is, however, the response that the accused later gave to the Bar's investigators when they inquired, and that is what he alleged in his signed Answer to the Bar's formal complaint. Again, it is noteworthy that the accused did not defend his actions by telling the Bar that $2,500 was a reasonable fee, justified by Klemp's performance and expertise, although that was the explanation that he had used with his clients.

Based on the tape, this court finds that the accused intentionally lied when he told the Bar's investigators that his clients had not objected to paying Klemp's fee and also when he told them that his clients had specifically directed that specific payment from the clients' share of the settlement. We believe that the circumstances and the words "we feel ripped off" are too vivid to permit either misunderstanding or memory lapse as an explanation for the false statement.

■ The accused attempts to shift blame to his clients on the basis that he did not know that the conversation had been taped and that the fact of taping it was kept secret for a long time after he had told the Bar that he had authority to pay Klemp from the clients' funds and that the clients did not object to the amount.[1] We are not impressed. Trying to shift blame in that manner does nothing to rehabilitate the accused's credibility. The accused's complaint about secrecy only contributes to the appearance that, when he lied, he did not believe that he would be found out.

The clients testified that they did not authorize or instruct any such payment. The affidavit of Mary Smith, submitted by the accused to support his earlier assertion that the clients specifically instructed him to pay Klemp $2,500 of the clients' funds in relation to the automobile, is not sufficient to overcome the other evidence of lack of credibility on that factual question, in light of the other circumstances concerning the affidavit. Those circumstances include the affiant's equivocal sworn testimony about the affidavit, which undercuts its credibility.[2] The

---

[1] ORS 165.540(1)(a), criminalizing certain interceptions of a telecommunication, does not apply where, as here, the one making the interception is a participant in the communication. *See also* ORS 165.540(3) (further limiting the provisions of subsection (1)(a), (b), and (c)).

[2] She testified in part as follows:

"Q With that correction, will you please tell the trial panel how this document came into existence?

"A Howard and I — he drafted the document, I read it to make sure that it was accurate, and I signed it.

"Q At what point in time was this made?

"A This was, I believe — I believe this was submitted — I'm not sure. Might have been in response to the [Bar's disciplinary] complaint. I'm not positive, exactly, to the time frame.

affidavit does not statethat Mrs. Binns[3] heard the clients instruct a payment from their share of the proceeds, or a payment of $2,500 for handling the automobile transaction. It reports that the accused argued that Klemp should not be paid at all and that the clients thought he should be. Mrs. Binns testified that she went in and out of the room during this discussion.

The tape discloses additional indications of the accused's dishonesty which we consider only on the question of credibility. In the initial portion of the taped conversation, the accused did not deny that he was to pay Klemp 10 percent of *the accused's* portion of the settlement (10 percent being $2,500), as the clients testified. Instead, the accused declared that the $2,500 paid to Klemp was for the separate task, relating to purchase of their new automobile that the clients directly requested that Klemp perform.

In the taped conversation, the accused first claimed that Klemp's alleged "exposure" to potential liability from the automobile transaction amounted to $25,000. Later, however, the accused attempted to justify the amount of the fee by claims that Klemp was possessed of special expertise. The accused did not rely on either justification when he

---

"Q Was it dealing with the Bar investigation, though?

"A I think it was, but I'm not positive.

"\* \* \* \* \*

"Q Your summary of the time here that Mr. Klemp accounted to you for his work on the Hopes' case totals 5.85 hours.

"A That would have been what he had given me.

"\* \* \* \* \*

"Q When the Hopes told Howard, your husband, that he, meaning Mr. Klemp, did the work and he deserved to be paid, are you sure that they told him that they wanted him to be paid $2500 in addition to the attorney's fees they were paying your husband? And how did they come up with $2500?

"A I don't know. I think they were talking about the 10 percent of $25,000 that they assumed Howard would get. I don't know.

"Q Do you know for a fact whether they understood that that was coming out of Howard's share or their share?

"A No. They had a big discussion about it, and it was not to be out of Howard's portion.

"Q And can you tell me why they would want to pay $2500 for that work[?]

"A I don't know. I couldn't tell you."

[3] The accused and Mary Smith were married at the time of her testimony.

spoke with the Bar's investigators. No evidence of the reality of any such risk, or of unusual expertise, appears in the record.

Significantly, the accused did not tell his clients that they had authorized or "specifically directed" him to pay Klemp the amount out of the settlement proceeds. Instead, the accused pointed out that he had *not* approved of Klemp's work and attempted to shift blame to the clients for their dissatisfaction.

This court does not credit the accused's testimony. Based on the other evidence, the Bar has by clear and convincing evidence proved a number of disciplinary violations. We detail those violation below.

## DISCIPLINARY VIOLATIONS

### 1. *Dishonesty*

ORS 9.527(4) provides that this court may punish a member of the Bar whenever it appears to this court that "[t]he member is guilty of willful deceit or misconduct in the legal profession." The accused violated that statute.

Code of Professional Responsibility, Disciplinary Rule (DR) 1-102(A)(3) provides that it is professional misconduct for a lawyer to "[e]ngage in conduct involving dishonesty, fraud, deceit or misrepresentation." The accused violated that disciplinary rule.

DR 1-103(C) provides that "[a] lawyer who is the subject of a disciplinary investigation shall respond fully and truthfully to * * * authority empowered to investigate or act upon the conduct of lawyers." The accused is guilty of violating that rule in his responses to the Bar's investigation.

DR 7-102(A)(5) provides: "In the lawyer's representation of a client or in representing the lawyer's own interests, a lawyer shall not: * * * [k]nowingly make a false statement of law or fact." The accused also violated that rule by his false statement to the Bar's investigators outlined above.

DR 7-101(A)(3) provides in part: "A lawyer shall not intentionally: * * * [p]rejudice or damage the lawyer's client during the course of the professional relationship

except as required under DR 7-102(B)." The accused violated that rule. He acted to his clients' prejudice in that he paid Klemp from the clients' funds without their approval, advocated that they accept that fee amount, and tried to persuade them to accept such a large fee as a reasonable amount.

## 2. *Excessive Fee*

DR 2-106(A) provides: "A lawyer shall not * * * charge or collect * * * [a] clearly excessive fee." The accused argues that the Bar's charge of violation of the excessive fee disciplinary rule requires proof that a lawyer's acts in relation to an excessive fee must be motivated by a desire to provide a personal, economic benefit to that lawyer.

We need not decide that question, because the evidence in this case establishes that, in any event, personal benefit is present. The evidence establishes that the accused was to pay Klemp out of his own funds for Klemp's work, and it is established that $2,500 would be the amount that the accused owed Klemp for covering for him regarding the clients' settlement and other activities while the accused was on vacation. No other money was shown to have been paid to Klemp for the work that Klemp did for the accused while the latter was on vacation. Moreover, documents produced by the accused and received in evidence in this case demonstrate that, during the period of time in question, Klemp was in arrears in the payments due by him as tenant to the accused as landlord. The accused's office also borrowed $1,000 from Klemp to meet payroll the first part of August, according to Mrs. Binns. Evidence of a discrete repayment of that loan has not been pointed out to us. The accused is guilty of charging and collecting an excessive fee.[4]

## SANCTIONS

### 1. *ABA Standards*

This court refers to the American Bar Association's *Standards for Imposing Lawyer Sanctions* (1991) (ABA

---

[4] Other allegations concerning use of inaccurate documents, trust account rules, and fee disputes need not be resolved to arrive at the disposition of this case, because the sanction is determined based on the charges discussed above, whether or not additional violations may arise out of the facts found.

Standards), as well as our case law, to assist in determining appropriate sanctions in lawyer discipline cases. *In re Haws*, 310 Or 741, 753, 801 P2d 818 (1990). The ABA Standards establish an analytical framework using four factors: duty violated, mental state involved, injury sustained, and aggravating or mitigating circumstances. ABA Standard 3.0.

*A. Duty To Client.* In this case, the accused violated his duty to his clients to preserve their property and to deal honestly with them and to tell the truth. ABA Standards 4.1 and 4.6. Additionally, the accused violated his duties to the profession. ABA Standard 7.0.

*B. Mental State.* We find that the accused acted intentionally when he paid $2,500 of his clients' funds to Klemp, when he attempted to justify that amount to his clients, and when he made deceitful statements to the Bar about the payment. "Intentional" is the most culpable mental state under the ABA Standards.

*C. Injury.* The accused caused actual injury to his clients. They lost over $2,000 that they did not legitimately owe.

Drawing together the factors of duty, mental state, and injury — before examining aggravating and mitigating factors — the ABA Standards provide:

"4.11 Disbarment is generally appropriate when a lawyer knowingly converts client property and causes injury or potential injury to a client."

"4.61 Disbarment is generally appropriate when a lawyer knowingly deceives a client with the intent to benefit the lawyer or another, and causes serious injury or potentially serious injury to a client."

"4.12 Suspension is generally appropriate when a lawyer knows or should know that he is dealing improperly with client property and causes injury or potential injury to a client."

"7.1 Disbarment is generally appropriate when a lawyer knowingly engages in conduct that is a violation of a duty owed to the profession with the intent to obtain a benefit for the lawyer or another, and causes serious or potentially serious injury to a client, the public, or the legal system."

"7.2 Suspension is generally appropriate when a lawyer knowingly engages in conduct that is a violation of a duty owed to the profession, and causes injury or potential injury to a client, the public, or the legal system."

■ Where an accused has converted client funds dishonestly to pay the accused's own personal debts, Oregon case law generally holds that the appropriate sanction must be disbarment. *In re Whipple*, 320 Or 476, 488, 886 P2d 7 (1994); ORS 9.527(4) (authorizing disbarment for "willful deceit"); *In re Howard*, 304 Or 193, 743 P2d 719 (1987); *In re McCormick*, 281 Or 693, 697, 576 P2d 371 (1978). The court held in *In re Pierson*, 280 Or 513, 518, 571 P2d 907 (1977), that a single act of conversion by a lawyer of a client's funds held in trust will result in disbarment, even when the lawyer later pays the money back. In the present case, the accused paid the amount of Klemp's fee, an amount to which the clients had not agreed, and paid it out of the clients' funds. The accused himself acknowledged that he did not think that the money could be retrieved short of suing Klemp for it. The accused's unauthorized act deprived his clients of the use of their money, thereby constituting a conversion. *Quarries v. Wodtli*, 308 Or 406, 413, 781 P2d 1196 (1989) (defining conversion).

*D. Aggravating And Mitigating Circumstances.* The following aggravating factors exist in this case: ABA Standards 9.22(b) dishonest or selfish motive; (c) a pattern of misconduct (charged an excessive, unauthorized fee, then lied to clients, and then lied to Bar investigator); (h) vulnerability of victims; (i) substantial experience in the practice of law; (j) indifference to making restitution. The following mitigating factors are present: ABA Standards 9.32(a) absence of a prior disciplinary record; (i) delay in disciplinary proceedings.

The aggravating factors outweigh the mitigating factors. In all the circumstances, disbarment is the appropriate sanction.

The accused is disbarred.