Argued and submitted November 4, 1987, accused disbarred August 30,
reconsideration denied October 18, 1988

In re Complaint as to the Conduct of

# JAMES H. PHELPS,
*Accused.*

## (OSB 85-102, 86-19; SC S34047)

760 P2d 1331

────────────────

Mark M. McCulloch, Portland, argued the cause and filed a brief for the accused.

George A. Riemer, General Counsel, Oregon State Bar, Lake Oswego, argued the cause and filed a brief for the Oregon State Bar.

Before, Peterson, Chief Justice, and Lent, Linde, Carson, Jones and Gillette, Justices.

PER CURIAM

## PER CURIAM

The Oregon State Bar charged the accused with violating numerous disciplinary rules in his handling of four different transactions. A Trial Panel of the Disciplinary Board found most of the charges proven by clear and convincing evidence and decided that the accused should be suspended from the practice of law for three years and required to pass the ethics portion of the Bar examination as a condition of reinstatement. On review de novo in this court, the Bar contends that the accused should be disbarred because his professional misconduct included misappropriation of funds belonging to clients. We agree that the accused be disbarred.

The four transactions giving rise to the Bar's charges involved, first, the accused's role in the sale of real property by Mr. and Mrs. Bennatt to the Rajneesh Investment Corporation; second, his handling of the estate of Charles E. Messinger; third, his signing and notarizing in the name of his client, Mary Ann Love, a document purporting to settle a claim; and fourth, his role in the dissolution of a partnership between Edgar Ronald Alley and Jack Alley. The complaint of misappropriation and, therefore, the resulting appropriate sanction is involved in first two transactions.

### I. THE BENNATT SALE

Mr. and Mrs. William Bennatt sold their store in Antelope to the Rajneesh Investment Corporation (RIC). The Bar's complaint alleged that the accused represented the RIC in this transaction. The accused denied this, and the Bar admits that the allegation misidentified his client; but although the complaint was not further amended, the accused makes nothing of this. The parties and the Trial Panel proceeded on the premise that the accused represented the Bennatts. He also acted as the escrow agent in the transaction, but because the Bar did not charge him with a conflict of interest,[1]

---

[1] Regulations of the Real Estate Commissioner, see ORS 696.541, require escrow agents to be impartial between the parties to a transaction. OAR 863-50-020(1) provides: "An escrow agent shall act without partiality to any of the principals to an escrow transaction." Potentially this can conflict with a lawyer's duty of loyalty to his own client. See, e.g., DRs 7-101(A)(1) and (3), 7-104(A)(2), 5-101(A), and 5-105(A), and Ethics Opinion No. 340 ("[As escrow agent, the attorney] must * * * represent one or the other; and he cannot attempt to be an impartial scrivener, representing neither party to the documents or both."); cf. Ethics Opinion No. 309 ("Insofar as an attorney can avoid preparation of substantive documents or the expression of a legal opinion, he can act as an independent escrow agent."). See also In re Barrett, 269 Or 264, 524 P2d 1208 (1974). Because the question was not raised in this case, we have no occasion to decide it.

we shall not pursue that question.

The crux of the complaint is that the parties agreed to prorate unpaid property taxes, the Bennatts to pay the taxes accrued prior to March 3, 1982. The accused asserted on the closing statement that the taxes had been paid, and he withheld from the funds he disbursed to the Bennatts a sum sufficient to pay them, but he did not in fact transmit the sum due the tax collector. RIC brought this to his attention by a letter of October 22, 1983, including copies of the closing statement showing that money had been reserved to pay the taxes. The accused responded that he had made a mistake and would immediately take steps to pay the taxes and accrued interest, but the taxes remained unpaid. The accused finally paid them by two checks on April 4 and 29, 1985, the month after the RIC wrote a letter of complaint to the Bar.

The Bar charged, and the Trial Panel found, that the accused engaged in "conduct involving dishonesty, fraud, deceit or misrepresentation," DR 1-102(A)(3), *former* DR 1-102(A)(4);[2] that he neglected a legal matter entrusted to him, DR 6-101(B);[3] that he failed to comply with the obligation to keep client funds in a trust account, DR 9-101(A);[4] and

---

[2] Current DR 1-102(A) provides:

"It is professional misconduct for a lawyer to:

"* * * * *

"(3) Engage in conduct involving dishonesty, fraud, deceit or misrepresentation."

Former DR 1-102(A) provided:

"A lawyer shall not:

"* * * * *

"(4) Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation."

We use the present subsection numbers rather than the previous numbers of similar subsections.

[3] DR 6-101(B) provides:

"A lawyer shall not neglect a legal matter entrusted to the lawyer."

[4] DR 9-101(A) provides:

"All funds of clients paid to a lawyer or law firm, including advances for costs and expenses, shall be deposited and maintained in one or more identifiable trust accounts in the state in which the law office is situated and no funds belonging to the lawyer or law firm shall be deposited therein except as follows:

"(1) Funds reasonably sufficient to pay account charges may be

that he failed to maintain complete records of a client's funds and account to the client for them, DR 9-101(B)(3).[5]

Aside from the first charge, the evidence leaves no doubt of these violations.[6] Only the charge of dishonest conduct requires extended discussion. The initial portion of this discussion is general and relates to the charges of dishonest conduct arising in both the first and second causes of complaint.

At the outset, it is important to distinguish between a charge of dishonesty by misappropriation[7] under DR 1-102(A)(3) and a charge of failing to maintain funds in a trust account under DR 9-101(A). Though conduct leading to the latter charge often precedes conduct leading to the former charge, the two are not the same. A lawyer may remove money from a trust account (a violation of DR 9-101(A)) before intentionally appropriating that money for the lawyer's own purposes (a violation of DR 1-102(A)(3)), but removal of money from a trust account does not necessarily constitute an intentional misappropriation. The difference between the two

---

deposited therein.

"(2) Funds belonging in part to a client and in part presently or potentially to the lawyer or law firm must be deposited therein but the portion belonging to the lawyer or law firm may be withdrawn when due unless the right of the lawyer or law firm to receive it is disputed by the client in which event the disputed portion shall not be withdrawn until the dispute is finally resolved."

[5] DR 9-101(B) provides:

"A lawyer shall:

"* * * * *

"(3) Maintain complete records of all funds, securities and other properties of a client coming into the possession of the lawyer and render appropriate accounts to the lawyer's client regarding them."

[6] The Bar also charged, and the Trial Panel found, that the accused violated DR 9-101(B)(4), which obliges a lawyer to deliver promptly on request funds or other property that the client is entitled to receive. This charge may have been based on the erroneous allegation that RIC was the accused's client, because the Bennatts did not ask that the tax funds be delivered to them and were not entitled to receive them but only to have them properly applied according to the terms of the sale. We do not find a violation of DR 9-101(B)(4).

[7] Misappropriation is not the only conduct that can lead to a violation of the dishonesty disciplinary rule, as the finding that this accused falsely notarized a signature shows; but misappropriation is one kind of dishonest conduct that leads to certain disbarment if proven. The Bar does not seek disbarment for the dishonest notarization. See part III, infra.

is reflected in the sanctions. If the Bar can prove a lawyer guilty of dishonesty by intentionally appropriating clients' funds to the lawyer's own use, the sanction is disbarment. *See, e.g., In re Laury,* 300 Or 65, 76, 706 P2d 935 (1985). Failing to maintain funds in a trust account does not require intent, and it carries a much lesser sanction. *See, e.g., In re Mannis,* 295 Or 594, 597 (1983) (failing properly to deposit or maintain funds in a trust fund is a "strict liability" offense, lawyer reprimanded).

*In re Holman,* 297 Or 36, 682 P2d 243 (1984), analyzed a charge of dishonesty under DR 1-102(A)(3) *(former* DR 1-102(A)(4)). After stating that intentional appropriation of client funds to a lawyer's own use "if established * * * is sufficient to result in disbarment," *id.* at 56, the court noted that the violation has three elements: (1) A lawyer (2) engaging in conduct (3) involving dishonesty. *Id.* at 57. As to the first element, it is not necessary that the lawyer be acting in his capacity as a lawyer rather than, for instance, as a trustee, in some other fiduciary capacity, or as an escrow agent. The second element required little discussion in that case. On the third element, the court wrote:

> "The remaining question is whether that conduct 'involved dishonesty.' The grouping of the noun 'dishonesty' with the other three nouns, 'fraud, deceit or misrepresentation,' might suggest that in order for conduct to involve dishonesty it must partake of some kind of deception in the sense of misleading the victim of the conduct. We do not so conclude. Embezzlement is dishonesty. *We hold that a lawyer who holds money in trust for another and converts that money to his own use has engaged in conduct 'involving dishonesty' within the meaning of DR 1-102(A)(4)."*

*Id.* at 57-58 (emphasis added). The remaining inquiry in *Holman* therefore was whether the accused took and withheld the property with "intent to appropriate that property to himself." *Id.* at 66. The burden of proving clearly and convincingly both that the accused took the property and that he had the requisite intent is on the Bar, and it does not shift to the accused. *Id.* at 67. However, the burden may be satisfied by drawing inferences from the evidence. *Id.*

In *Holman,* the evidence consisted largely of check stubs showing that the accused had written checks to himself

or to cash on his "office client trust account" and either deposited them in his general office account or cashed them outright. There was little if any evidence showing for what the money actually had been used. The court stated that this was "sufficient evidence to permit an inference that the accused had the necessary intent to make him guilty." *Id.* at 67. The accused, however, brought forward evidence tending to show that at the time of the transfers, abuse of prescription drugs and alcohol had so impaired his mind that he had been unable to realize that what he was doing was improper. This evidence caused the court to doubt that the accused had the necessary intent to convert the funds to his own use. The court therefore found Holman not guilty of violating the dishonesty disciplinary rule.

*Holman* shows that organic disability can negate the intent necessary for a violation of DR 1-102(A)(3). The present accused makes no such claim, but he denies that he had the requisite intent to appropriate the funds to himself. The accused does not dispute that he withdrew the funds, but he claims that he did not know that he was withdrawing funds to which he was not entitled because of his negligent record-keeping. He asserts that whenever he withdrew funds from the trust account, he believed that he was doing so properly, and denies that he intentionally appropriated the funds to himself. The question therefore is whether the Bar has produced clear and convincing evidence of an intentional misappropriation.

The Trial Panel's opinion is ambivalent on this question. On the one hand, the panel concluded that the accused had violated DR 1-102(A)(3), which assumes that the panel found dishonest conduct. On the other hand, in discussing sanctions, the trial panel stated: "There has not been established by clear and convincing evidence any dishonest or selfish motive in any of the charges before the panel." The Trial Panel quoted from Justice Lent's concurring opinion in *In re Smith,* 292 Or 84, 102-03, 636 P2d 923 (1981), passages referring to an "innocent conversion" that does not require disbarment, and it continued:

> "This is not to suggest that the conversion of funds in this case can in any way be condoned because of the current lack of records which could be utilized to establish the transfer or absence of funds but only to say that in this record there is

insufficient clear and convincing evidence to so find the conduct at the more reprehensible end of the conversion spectrum or one founded in evil intent."

We disagree with the Trial Panel that the Bar's evidence in this case does not compel the inference that the accused had the necessary intent to appropriate the funds to himself.

The Bar's evidence concerning the trust account is the monthly bank statement for the account, containing the usual record of check numbers and their amounts, deposits, and withdrawals other than checks. There is direct evidence showing that several checks that drained the trust account were made out to the accused by the accused with no record by him what he did with the funds.[8] There existed at one time three sources of this information: the accused's own account records (including ledger cards for individual files), the check stubs, and the microfiche copies of each check that banks make at the time the checks are cleared through the bank.

The accused testified that his former girlfriend, Mary Ann Love, had destroyed or hidden his account records and cancelled checks. Mary Ann Love testified that she had neither destroyed nor hidden those records; the accused had taken all his belongings with him when he moved out of her house. The Trial Panel did not resolve the credibility of this conflicting testimony when it made its findings, but, irrespective of Love's testimony, we are convinced from examining the

---

[8] The table below lists the checks that were written during the relevant period, were photocopied from the bank's microfiche, and were legible. It is by no means exhaustive.

| Ck. # | Amount | Payee | Notation |
|-------|--------|-------|----------|
| 957 | $ 500 | J. Phelps | none |
| 956 | $ 650 | First Intst acct | illegible |
| 946 | $ 800 | J. Phelps | "___ fees" |
| 943 | $2000 | J. Phelps | illegible |
| 942 | $3000 | G. Bogan | "___ for expenses" |
| 939 | $3000 | J. Phelps | "fees" |
| 932 | $ 900 | J. Phelps | none |
| 931 | $3000 | J. Phelps | "fees" |
| 903 | $1000 | J. Phelps | "ind." |
| 882 | $1020 | State center realty | none |
| 880 | $1500 | J. Phelps | none |
| 869 | $ 65 | J. Phelps | "___ Mktng" |
| 874 | $2000 | J. Phelps | none |
| 854 | $1294 | J. Phelps | none |
| 804 | $1500 | J. Phelps | "fees" |

written record that the accused lied. In simple terms, we conclude that the accused took the money from the trust account for his own use. This conversion of funds was an act of dishonesty warranting disbarment.

To round up the remaining evidence relating to the charges of dishonesty in this and the following cause of complaint, there is evidence that the accused was in severe financial straits during the period that the money was withdrawn. The accused admitted that he never "balanced" the trust account (defined by the questioner as "sit[ting] down and work[ing] through the account to simply see where it was") during the period in question.

The evidence that the accused made out the checks from his trust account to himself with no explanation allows an inference that the accused intended to appropriate the tax funds to his own use when he withdrew them from the trust account. We find clear and convincing evidence that the accused had the necessary intent. Therefore, we hold that the Bar has proven a violation of DR 1-102(A)(3) in connection with this matter.

## II. THE MESSINGER ESTATE

Late in 1981, the accused, as lawyer for the personal representative of the Messinger estate, received a $13,272.74 payment on a land sale contract, which he deposited in his trust account on November 9, 1981. The bank statement of the account on the same date showed a balance of $51,083.044, apparently including this deposit. By January 11, 1982, the trust account was drawn down to $1,173, but the $13,272.74 had not been distributed to the beneficiaries of the estate or the personal representative, and the accused could not explain what had happened to that sum.

The personal representative eventually retained another lawyer, David Glenn, for the estate. At least by October 13, 1982, if not earlier, the accused told Glenn that he would shortly give him an accounting, but he did not disclose that he did not have the funds from the deposit of the previous November to transfer to Glenn. He finally made that disclosure in a letter of March 8, 1983, and he transmitted a $9,000 check at that time. In a "final accounting" dated March 24, the accused retained attorney fees of $1,935,

although he had not obtained authorization from the court as required by ORS 116.183(1). The accused testified that he was not aware of that requirement. On April 4, 1985, he agreed to Glenn's request to repay the attorney fees.

In addition to the foregoing, the accused did not timely file tax returns for the estate, causing the estate to have to pay a penalty.

The Bar charged, and the Trial Panel found, dishonest conduct (DR 1-102(A)(3)), neglect of a legal matter (DR 6-101(B)), failure to maintain client funds in a trust account (DR 9-101(A)), failure to maintain records and account to the client (DR 9-101(B)(3)), and failure to deliver funds promptly to a client upon request (DR 9-101(B)(4)). Only the charges of failure to maintain client funds in a trust account and "dishonest conduct" require extended discussion; we find clear and convincing evidence of the other violations.

The parties do not dispute that the funds from the land sale contract were "funds of clients" within the meaning of DR 9-101(A). The accused was the lawyer for the personal representative, who in turn is charged with responsibility for managing the estate for its owners, the heirs. *See* ORS 114.265. The funds belonged to the estate, which was administered by the personal representative, who was the accused's client, so the funds were "funds of clients."[9]

In addition to the evidence discussed in part I relating to both dishonesty charges, the record contains evidence bearing only on the accused's intent in the Messinger matter. He claims that it was possible that he deposited the funds from the land sale contract, about $13,000, in his trust account rather than opening a separate estate account, as he usually did, because he thought that would be the estate's only deposit. During the same period, he was winding up his practice in Madras and moving to Portland, and was not keeping careful track of records and files. He testified that as a result, he must have forgotten that he had put the $13,000 into the trust account. He thought the ledger card had been mistakenly put into the file rather than into the box with the other cards.

---

[9] This case does not present the problem encountered in *In re Howard,* 304 Or 193, 743 P2d 719 (1987) (social security checks sent erroneously because no one told the government that the testator was dead.)

As a result, his cross-referencing system broke down and caused him to lose track of the money from the estate. The accused's sudden feeble memory lapse is too convenient to be accepted.

Again, we draw from the evidence clear and convincing proof that the accused intentionally appropriated the funds to his own use. Accordingly, the court finds that the Bar has proven a violation of DR 1-102(A)(3) in connection with the Messinger estate.

## III. CLAIM OF MARY ANN LOVE

During 1982 and 1983, the accused lived in Portland with Mary Ann Love. The breakup of their relationship has some bearing on the other cases under review, because, according to the accused, Ms. Love destroyed his financial records and other documents when he moved out of her house. While living with Ms. Love, in November 1983, the accused represented her in a claim against Kris Clark, which the accused settled for $4,000. He signed Ms. Love's name to the settlement agreement and notarized her signature.

The Bar charged the accused with illegal conduct, DR 1-102(A)(2), and dishonest conduct, DR 1-102(A)(3). The Trial Panel found that the accused had express authority from Love to sign the settlement documents and therefore did not violate DR 1-102(A)(3) when he signed them in her name. However, the Trial Panel found that his notarization of her signature when he knew that she had not signed the agreement violated DR 1-102(A)(2) and DR 1-102(A)(3) because ORS 194.310(3) proscribes such conduct. The accused does not challenge these findings and conclusions, and we agree with them.

## IV. THE ALLEY BROTHERS PARTNERSHIP

Between 1979 and 1982, the accused represented Edgar Ronald Alley and his brother, Jack Alley, in various matters. In 1982, he advised the brothers in connection with the dissolution of a farming partnership between them. The Bar charged that his conduct violated DR 5-105(A) and (B),

governing the representation of conflicting interests.[10] The accused maintained that the brothers came to him with a plan of dissolution already worked out, that he told them they would need separate lawyers if any hint of conflict between them developed, and that, in effect, he acted as a scrivener and not as a legal counselor to them. The documents prepared by the accused included an agreement dividing assets and liabilities, some bills of sale, and various property and credit instruments.

The Trial Panel concluded that the interests of Edgar Ronald Alley and Jack Alley were adverse, and that it was not "obvious" (DR 5-105(C)) that the accused could adequately represent both brothers. In fact, a disagreement between them concerning the value of certain equipment arose during the negotiation of the dissolution agreement. The Trial Panel therefore found that the accused violated DR 5-105(A) and 5-105(B).

The accused stated that he told the Alleys that he was reluctant to get involved in any dispute between them and that he would refer them to separate lawyers at any hint of conflict. He maintains that he only agreed to prepare documents to carry out a prearranged agreement between the brothers, that he did not represent one "against" the other but sought to serve the partners' joint interest. We do not find clear and convincing evidence that the accused violated DR 5-105(A) in initially accepting the proffered employment, but he violated DR 5-105(B) by continuing the employment when it became clear that more than professional preparation of standard documents for an agreed transaction was required in order to safeguard the partners' separate interests.

## V. MITIGATION

The accused presented, and the Trial Panel found, the following facts in mitigation:

---

[10] DR 5-105 states:

"(A) A lawyer shall decline proffered employment if the exercise of the lawyer's independent professional judgment in behalf of a client will be or is likely to be adversely affected by the acceptance of the proffered employment, except to the extent permitted under DR 5-105(C).

"(B) A lawyer shall not continue employment if the exercise of the lawyer's independent professional judgment in behalf of a client will be or is likely to be adversely affected by the lawyer's representation of another client, except to the extent permitted under DR 5-105(C)."

(1) The accused has not previously been involved in any disciplinary proceeding.

(2) The accused cooperated fully with the Bar's investigation of his conduct.

(3) The accused was suffering severe emotional distress during the relevant period due to his divorce and related separation from his children, as well as his father's serious illness.

(4) The accused carried a large caseload and worked long hours during the relevant period, causing him to experience stress and "lawyer burnout," for which he received counseling.

(5) The accused suffered economic hardship during the relevant period because his title companies failed and he was unemployed for various periods.

(6) The accused's character and reputation were good.

(7) The accused was clearly remorseful.

(8) The accused made a good faith effort to pay restitution.

With respect to the last finding, the Trial Panel also found that although the accused had made a good faith effort, the restitution was not timely enough to constitute mitigation. The accused argues that his restitution should be deemed timely, but the court agrees with the finding of the Trial Panel.

The Trial Panel also used, as a mitigating factor, the inconsistent finding that there was not clear and convincing evidence that the accused had acted with a dishonest or selfish motive in the charges before it. We have found that there was such evidence. Therefore, this mitigating factor is not applicable.

Even though we adopt the Trial Panel's findings of facts in mitigation with one exception, that exception destroys the weight of all the other findings. A lawyer may suffer all the claimed disabilities and may have the greatest of attributes, but if he or she steals funds from a client, the sanction is disbarment.

# VI. SANCTION

The accused is disbarred.