PER CURIAM
**43 In this lawyer discipline proceeding, the Oregon State Bar charged respondent[1] with multiple violations of the Rules of Professional Conduct (RPC) based on her mishandling of client funds, including violating RPC 8.4(a)(3) (conduct involving dishonesty) by knowingly converting client funds. A trial panel of the Disciplinary Board conducted a hearing and determined that respondent had committed all of the charged violations. Although this court has repeatedly imposed disbarment as the presumptive sanction for a lawyer who converts client funds, the trial panel determined that mitigating factors, in particular respondent's mental disabilities, supported imposing a two-year suspension from the practice of law.
The Bar seeks review of the trial panel's sanction determination, urging this court to impose a sanction of disbarment. Respondent, for her part, does not challenge the trial panel's determinations that she committed the charged violations in the ways alleged, but she urges this court to affirm the trial panel's decision that suspension is the appropriate sanction in this case. For the reasons that follow, we affirm the trial panel's determination that the respondent committed all of the charged violations, and we conclude that the appropriate sanction is disbarment.
I. FACTS
Respondent was admitted to practice law in Maryland and Pennsylvania in 2000. She moved to Oregon and was admitted to the Oregon Bar in 2008. From 2011 to 2015, respondent was a solo practitioner, handling many matters for which she represented clients on a contingent-fee basis. Respondent was solely responsible for bookkeeping and managing her client trust account. In the spring of 2014, respondent found herself in financial trouble. In June, her landlord agreed to forbear collecting rent for six months and, in August 2014, respondent stopped regularly paying **44 her employees their full wages. The disciplinary charges arise out of respondent's mishandling of client funds between August 2014 and January 2015.
A. The Brown Matter
Respondent represented Brown and negotiated a settlement in which the opposing party agreed to pay Brown $6,000. On August 28, 2014, Brown emailed respondent, emphasizing that she urgently needed her portion of the settlement funds and asking why it was taking so long for the other side to pay. Respondent initially responded, falsely, that the settlement check had not yet been delivered. At the end of the day, however, respondent sent an email to Brown reporting that she had received and "just" deposited the check. In fact, respondent had deposited the $6,000 check into her client trust account the day before those emails, and, by the time that responded reported having deposited Brown's check, most of the funds from that deposit had been used to *4 honor three outstanding checks that had been written on respondent's client trust account. The following day, August 29, a fourth check was paid from trust account funds, bringing the balance of the account to $44.31. Also on August 29, respondent sent an email to Brown, claiming that the Bar would not allow her to disburse any of the $6,000 until she received approval from the bank, likely some time the following week.
In mid-September 2014, Brown again contacted respondent to ask when she would receive her portion of the settlement. Respondent claimed, on September 18, that Brown's check had been sent out in the mail days earlier, but she prepared Brown for the possibility that the check might not arrive, offering to "place a stop check on the one mailed and walk into a local branch and deposit" a new check in Brown's account. Ultimately, on September 22, respondent wrote Brown a trust account check for $3,590. By then, respondent had made three new deposits of funds from other sources, bringing her trust account back to a level that was almost, but not quite, sufficient to cover the check that she wrote to Brown. The bank, nevertheless, honored the check and sent respondent a notice that she had overdrawn her trust account by $70.73.
**45 Respondent deposited $80 of her own money into the trust account and, when asked to explain the overdraft to the Bar, claimed that she "accidentally wrote the client check for $3590 instead of $3509 as was appropriate." However, calculations that respondent had written on a copy of her fee agreement with Brown listed a total due to Brown of $3,590. Moreover, when respondent provided the Bar with an account statement to support her claim that fees and costs left only $3,509 due to Brown, respondent listed fees for service and filing Brown's case that were $66 more than the actual service and filing fees.
B. The McCarty Matter
On November 3, 2014, respondent deposited into her trust account a $70,000 settlement check that she had received on behalf of McCarty, of which McCarty was to receive $44,000. When respondent deposited the McCarty settlement check in her trust account, it brought the account balance to $70,303. The day of that deposit, respondent disbursed $45,000 of the trust account funds to herself for her own personal and office expenses and paid another creditor $260, immediately reducing the trust account balance to $25,043. By November 14, respondent had also withdrawn an additional $24,443 of the trust account funds to pay two other clients settlement distributions that she had owed them since at least July 2014, as well as other expenses. Thus, respondent spent all but $297 of McCarty's settlement proceeds to pay other clients, her creditors, and herself.
On December 8, 2014, notwithstanding having depleted the trust account of McCarty's settlement funds, respondent wrote a check to McCarty for $44,000 from the trust account. When McCarty deposited the check, it was dishonored for insufficient funds, and McCarty paid a $35 overdraft fee. McCarty immediately called respondent, who falsely claimed that the bank had made an error and said that she would look into it and fix it.
C. The Godier Matter
On December 11, 2014, respondent received and deposited into her client trust account a check for $100,000, paid in settlement to Godier by one of two defendants in a **46 case that was going to trial the following month. Of that $100,000, $52,000 was due to Godier after accounting for attorney fees and expenses. The day that respondent deposited Godier's check, however, respondent used trust account funds to pay McCarty $44,030-McCarty's share of the settlement plus reimbursement for the overdraft fee that McCarty had paid. Respondent also made two other withdrawals of trust account funds, which she described in her records as "law offices withdrawals"-one for $35,510, and one for $15,010. The deposit and those withdrawals left a balance of $6,080 in respondent's trust account, and respondent disbursed $6,000 to Godier.
On the first day of Godier's trial against the non-settling codefendant, January 12, 2015, respondent wrote a check to Godier on the trust account for $46,000, the remainder of the settlement funds due to Godier. At the *5 time when respondent wrote that check, there was only about $1,300 in her trust account, and the $46,000 check to Godier was dishonored for insufficient funds. Respondent made false excuses to Godier and told him to redeposit the check. He did so, but the check was dishonored again on January 15. Godier by then had overdrawn his own checking account and was desperate for his settlement funds. Respondent's husband mailed Godier $1,000 in cash, but respondent never paid Godier the $46,000 that she owed him from the settlement. Godier eventually applied to the Bar's Client Security Fund (CSF) for help, and CSF paid him $46,000. Respondent has since agreed that she will reimburse CSF for the amount paid to Godier.
D. Respondent's Mental Health
In the middle of the Godier trial, on January 14, 2015, respondent was involved in a one-car accident and was diagnosed with a concussion. Several days later, respondent was admitted to the hospital complaining that she was "overwhelmed with life" and had been experiencing suicidal thoughts for the preceding two weeks. Health care professionals hospitalized respondent for four days out of concern that she presented a suicide risk and discharged respondent with a diagnosis of major depressive disorder. She attended an outpatient treatment program for impaired professionals **47 through March 2015, during which she received a diagnosis of major depressive disorder as well as Post Traumatic Stress Disorder (PTSD). In May 2015, respondent was living in Maryland and began therapy with psychologist Dr. Kronfli, who also diagnosed major depressive disorder and PTSD.
Respondent told her various mental health providers that she had suffered from untreated PTSD since experiencing a traumatic event as a young adolescent. At the disciplinary hearing, respondent testified that she had also been very strongly affected by the terrorist attacks of September 11, 2001, because she had been a student in Washington, D.C. at that time and could see the smoke from the attack on the Pentagon. Respondent testified that she always struggled around the anniversary of the attacks and that, beginning around September 11, 2014, she suffered symptoms of her depression and PTSD that were triggered both by her memories of the terrorist attack and by her financial difficulties.
Kronfli continued to treat respondent for her psychiatric conditions through the time of the disciplinary hearing in September 2016, and respondent relied on his testimony at the hearing. Kronfli testified that, based on respondent's report in January 2015 that she was "overwhelmed with life," her symptoms of depression "had gotten to a point where she did not have * * * the appropriate amount of coping tools" to deal with the "stressors that she was experiencing at that time which would make it very hard for her to function in her job." He explained that, if respondent was under an "overwhelming amount of stress," then the symptoms of her untreated mental conditions likely "caused her enough distress to perhaps influence or cause her to do something that she normally would not have done" if she were managing her stressors "in an appropriate or adaptive way."
The Bar offered testimony from another psychologist, Dr. Warford, who reviewed respondent's treatment records but did not examine her. Warford testified that respondent's records showed inconsistencies that caused him to question whether she was impaired. For example, Warford explained that a cognitive assessment that respondent took in March 2015 showed a profile "essentially within normal range, with no overt evidence of depression, anxiety or anything **48 that would suggest a psychotic disorder." This is not the profile that Warford would have expected to see in a person who had recently been suffering from a major depressive disorder.
II. DISCIPLINARY VIOLATIONS
The Rules of Professional Conduct impose significant restrictions on how lawyers must keep and manage client funds. RPC 1.15-1. For example, RPC 1.15-1(a) provides, in part:
"A lawyer shall hold property of clients or third persons that is in a lawyer's possession separate from the lawyer's own *6 property. Funds, including advances for costs and expenses and escrow and other funds held for another, shall be kept in a separate 'Lawyer Trust Account' maintained in the jurisdiction where the lawyer's office is situated."
Lawyers are prohibited from depositing "the lawyer's own funds in a lawyer trust account," except for the "sole purpose of paying bank service charges or meeting minimum balance requirements on that account," and "only in an amount necessary for those purposes." RPC 1.15-1(b). Any fees or expenses that have been paid in advance must be deposited into the lawyer trust account and may "be withdrawn by the lawyer only as fees are earned or expenses incurred, unless the fee is denominated as 'earned on receipt,' 'nonrefundable' or similar terms and complies with Rule 1.5(c)(3)." RPC 1.15-1(c). In addition, a lawyer "shall promptly deliver to the client or third person any funds or other property that the client or third person is entitled to receive." RPC 1.15-1(d). Based on different aspects of the conduct described above, the Bar charged respondent with three causes of complaint:
(1) Based on respondent depositing her own funds to her lawyer trust account after Brown's check created an overdraft, the Bar charged respondent with violating RPC 1.15-1(b) (improper deposit of lawyer's own funds into trust account);
(2) Based on respondent's mishandling of the settlement funds for McCarty and Godier, the Bar charged respondent with violating RPC 1.15-1(a) (failure to keep separate client property) and RPC 1.15-1(c)
**49 (withdrawal of client funds before they are earned); and
(3) Based on respondent's misuse of Godier's settlement funds and the fact that his check was never honored, the Bar charged respondent with violating RPC 1.15-1(d) (failure to promptly deliver funds that a client is entitled to receive) and RPC 8.4(a)(3) (conduct involving dishonesty).[2]
The trial panel determined that respondent committed each of the charged violations and that she acted knowingly and intentionally in doing so. As noted, respondent does not challenge those determinations. We have reviewed the record de novo and agree with the trial panel that the Bar proved the violations by clear and convincing evidence. See ORS 9.536(2) (providing that, "[w]hen a matter is before the Supreme Court for review, the court shall consider the matter de novo"; BR 10.6 (same) ); BR 5.2 (Bar must establish misconduct by clear and convincing evidence).
III. APPROPRIATE SANCTION
The dispute in this case focuses on the appropriate sanction for respondent's violations of the disciplinary rules. The Bar contends that disbarment is the only appropriate sanction given the nature of respondent's violations. Respondent contends, however, that the trial panel correctly imposed a lesser sanction based on the presence of several mitigating factors. Most significantly, respondent contends that she suffered from untreated PTSD and major depressive disorder that began to affect her around September 11, 2014, to the point that she "could not conform her behavior to the RPC during the period September 2014 through January **50 2015," and that impairment of that magnitude justifies a departure from the presumptive sanction of disbarment.
A. Framework for Determining Appropriate Sanction
In considering the appropriate sanction, this court follows the analytical framework set out in the American Bar Association's *7 Standards for Imposing Lawyer Sanctions (1991) (amended 1992) (ABA Standards). In re Herman , 357 Or. 273, 289, 348 P.3d 1125 (2015). Under that framework, the court first considers three factors that point us to a preliminary determination of the appropriate sanction: (1) the ethical duty violated; (2) the respondent's mental state at the time of the misconduct; and (3) the potential or actual injury caused by the respondent's misconduct. Id. ; ABA Standard 3.0. Next, we consider whether any aggravating or mitigating circumstances are relevant to our determination of the appropriate sanction. Finally, we determine the appropriate sanction in light of this court's case law. Herman , 357 Or. at 289, 348 P.3d 1125.
B. Presumptively Appropriate Sanction
Although the parties' arguments focus on the fourth factor-aggravating or mitigating circumstances-we begin by briefly addressing the first three factors, which point to a preliminary determination that the appropriate sanction is disbarment.
1. Ethical Duty Violated
With respect to the ethical duty violated, we have determined that respondent engaged in conduct involving dishonesty, in violation of RPC 8.4(a)(3), by knowingly and intentionally converting to respondent's own use funds that belonged to her client Godier. See In re Peterson , 348 Or. at 335, 232 P.3d 940 (explaining that "dishonesty," within the meaning of RPC 8.4(a)(3), includes knowingly and intentionally converting client funds to the lawyer's use). We have also determined that respondent violated RPC 1.15-1(a) (failure to safeguard and keep separate client property); RPC 1.15-1(c) (withdrawal of client funds before they are earned); and RPC 1.15-1(d) (failure to promptly deliver funds that a client is entitled to receive), by failing to maintain McCarty and Godier's client money in trust, using McCarty and Godier's client money **51 to pay her business and personal expenses, and failing to promptly deliver to Godier the money due to him. Finally, we have determined that respondent deposited money in her client trust account for a prohibited purpose, in violation of RPC 1.15-1(b). In committing those violations, respondent violated the duty that she owed to her clients to preserve their client property and the duty that she owed to the public to maintain personal integrity. ABA Standards at 5; ABA Standard 4.1; ABA Standard 5.1.
2. Respondent's Mental State
As noted above, we agree with the trial panel's determination that respondent acted intentionally, meaning that respondent acted with the " 'conscious objective to accomplish a particular result.' " See , e.g. , In re Paulson , 346 Or. 676, 713, 216 P.3d 859 (2009), adh'd to as modified on recons. , 347 Or. 529, 225 P.3d 41 (2010) (quoting ABA Standards at 7). Indeed, we have emphasized that intent is the "distinguishing characteristic" of a misuse of client funds that rises to the level of "conversion involving dishonesty under RPC 8.4(a)(3)." In re Peterson, 348 Or. at 341 n. 5, 232 P.3d 940[3] ; see also In re Phelps , 306 Or. 508, 512, 760 P.2d 1331 (1988) ("A lawyer may remove money from a trust account * * * before intentionally appropriating that money for the lawyer's own purposes * * * but removal of money from a trust account does not necessarily constitute an intentional misappropriation."). Respondent does not dispute that she acted with the conscious objective to use her client's money for her own purposes, i.e. , that she acted intentionally, and the Bar has established by clear and convincing evidence that she acted intentionally.
3. Injury to Clients
Respondent's violations caused potential injury, as well as actual injury, to her clients. As explained, respondent took money that she was holding in trust for her clients and used it for other purposes. Respondent's violations involved her improper and dishonest use of funds that her **52 clients had entrusted to her. Although the bank honored the check to Brown, despite insufficient funds in the *8 account to do so, the bank refused to honor the checks that respondent wrote to disburse funds to both McCarty and Godier, forcing both to wait unnecessarily to receive the money due to them and exposing both to the risk of never recovering that money. Indeed, McCarty received her money only because the settlement money for Godier arrived to cover McCarty's check, but respondent never paid Godier the funds due to him.
4. Disbarment is the presumptively appropriate sanction
Drawing together the factors of duty, mental state, and injury, and before examining aggravating and mitigating factors, under both the ABA Standards and this court's case law, disbarment is the presumptively appropriate sanction. Respondent conceded at the disciplinary hearing that she deposited money in her client trust account for an improper purpose, that she was not honest with Godier regarding his settlement funds or the check that she wrote to him, that she commingled funds by writing the check to McCarty using Godier's settlement funds, and that she dishonestly converted Godier's funds.
The ABA Standards provide, "[d]isbarment is generally appropriate when a lawyer knowingly converts client property and causes injury or potential injury to a client." ABA Standard 4.11. Disbarment also is generally appropriate in cases when a lawyer has engaged in "intentional conduct involving dishonesty, fraud, deceit, or misrepresentation that seriously adversely reflects on the lawyer's fitness to practice." ABA Standard 5.11(b). Finally, under the ABA Standards, disbarment is generally appropriate when a lawyer has knowingly engaged in conduct that violates a professional duty, if the lawyer does so "with the intent to obtain a benefit for the lawyer or another, and causes serious or potentially serious injury to a client, the public, or the legal system." ABA Standard 7.1. All of those considerations apply to respondent's intentional misuse of McCarty's settlement funds and intentional conversion of Godier's funds.
**53 Moreover, this court often has stated that even a single act of intentional conversion of client funds presumptively warrants disbarment. In re Pierson , 280 Or. 513, 518, 571 P.2d 907 (1977) ("a single conversion by a lawyer to his own use of his client's funds will result in permanent disbarment"); In re Donovan , 327 Or. 76, 81, 957 P.2d 575 (1998) (same). We have found, and respondent does not dispute, that she intentionally converted Godier's client funds. Thus, under the ABA Standards and this court's case law, disbarment is the presumptive sanction.
C. No Relevant Mitigating Factors[4]
Although recognizing that disbarment is the presumptively appropriate sanction for respondent's violations, the trial panel recommended that respondent only should be suspended from the practice of law for two years. The trial panel primarily based that reduced sanction on its conclusion that respondent's depression and PTSD were a mitigating factor under ABA Standard 9.32(i).
ABA Standard 9.32(i) is part of a generally applicable list of mitigating factors "that may justify a reduction in the degree of discipline to be imposed." ABA Standard 9.31. It provides that a "mental disability or chemical dependency including alcoholism or drug abuse" is a mitigating factor when:
"(1) there is medical evidence that the respondent is affected by a chemical dependency or mental disability ;
"(2) the chemical dependency or mental disability caused the misconduct;
"(3) the respondent's recovery from the chemical dependency or mental disability is demonstrated by a meaningful and sustained period of successful rehabilitation; and *9 **54 "(4) the recovery arrested the misconduct and recurrence of that misconduct is unlikely."
ABA Standard 9.32(i).
The Bar raises two main challenges to the trial panel's reliance on ABA Standard 9.32(i). First, the Bar contends that, when a lawyer has knowingly misappropriated client funds for the lawyer's own use, a mental disability or chemical dependency is irrelevant to the sanction determination unless the impairment caused the lawyer's misconduct by preventing the lawyer from acting intentionally. As a second, alternative, argument, the Bar contends that respondent has failed to prove that mental disability was even a "substantial contributing cause" of her intentional misconduct and, thus, failed to establish the existence of the mitigating factor described in ABA Standard 9.32(i). We ultimately conclude that respondent has not proved the elements of ABA Standard 9.32(i), and we approve a sanction of disbarment on that basis. But we first briefly discuss the Bar's argument that our case law categorically requires disbarment for respondent's conduct.
1. Impairment as possible mitigation in past cases
The Bar is correct that some of our cases have used nearly categorical terms when describing disbarment as the sanction for a lawyer who intentionally converts client funds for another use. See e.g. , Phelps , 306 Or. at 520, 760 P.2d 1331 ("A lawyer may suffer all the claimed disabilities and may have the greatest of attributes, but if he or she steals funds from a client, the sanction is disbarment."); see also In re Laury , 300 Or. 65, 74, 77, 706 P.2d 935 (1985) (rejecting proposal that lesser sanction was appropriate because lawyer's alcoholism was "a disease and it [was] his illness from that disease that [had] caused his defalcations"). Other cases have suggested that, when a lawyer misappropriates client funds for the lawyer's own purposes, evidence of impairment is relevant only to the question of whether the lawyer acted intentionally, and not to mitigation. See , e.g. , In re Eads , 303 Or. 111, 124, 734 P.2d 340 (1987).
The lawyer in Eads misappropriated client funds but "presented the opinion of a psychologist to the effect that the [lawyer] would not have acted as he did were he **55 not dependent on drugs." Id . He urged this court to conclude that the impairment prevented him from acting intentionally but also, alternatively, that the impairment was a mitigating factor that justified a less severe sanction. The court's analysis suggests that it viewed the evidence of impairment as relevant only to the issue of intent. In rejecting the lawyer's request for a sanction less severe than disbarment, the court emphasized that "[a]n addiction can at some level be the cause of many misdeeds" but that, if the impairment does not interfere with the lawyer's ability to act intentionally, the connection is "too attenuated" to justify a reduced sanction for misconduct as serious as the intentional misappropriation of client funds. Id. at 124, 734 P.2d 340.
Our cases since Eads have generally adhered to that line of reasoning. For example, in In re Martin , 328 Or. 177, 193, 970 P.2d 638 (1998), a lawyer who misappropriated client funds urged this court to conclude that his mental conditions, including depression and PTSD, justified a sanction short of disbarment. We declined to do so, explaining that:
"we already have found that the accused's mental condition did not impair his ability to appreciate the wrongfulness of his conduct so as [to] preclude a finding that he intentionally misappropriated client funds. As we stated in In re Phelps, 'a lawyer may suffer all the claimed disabilities and may have the greatest of attributes, but if he or she steals funds from a client, the sanction is disbarment.' 306 Or. at 520 [760 P.2d 1331]. The same is true here."
See also In re Maroney , 324 Or. 457, 462, 927 P.2d 90 (1996) (concluding that a sanction of disbarment was appropriate for a lawyer who intentionally misappropriated client funds, despite the presence of several mitigating factors, including that the lawyer was experiencing personal and emotional problems at the time of the misconduct). The Bar concludes that those cases establish, in essence, an irrebuttable presumption that disbarment *10 is the appropriate sanction when a lawyer knowingly and intentionally converts a client's funds.
Respondent argues that our framework for determining the appropriate sanction according to the ABA Standards requires us always to consider whether mitigating **56 factors justify a lesser sanction, even if we consistently have concluded that disbarment remains the appropriate sanction for the intentional conversion of client funds. See In re Binns , 322 Or. 584, 596, 597, 910 P.2d 382 (1996) (considering aggravating and mitigating circumstances before concluding that "disbarment is the appropriate sanction" for lawyer who intentionally used $2,500 of client funds for purpose to which client had not agreed). In other words, respondent views our case law as establishing a very strong, but theoretically surmountable, presumption that disbarment is the appropriate sanction for a lawyer who intentionally converts client funds to the lawyer's own use. Respondent contends that a mental disability that meets the requirements of ABA Standard 9.32(i) is a particularly significant mitigating factor and should justify a reduced sanction, even for the intentional conversion of client funds.
2. Impairment as possible mitigation in this case
Ultimately, however, we need not decide whether there may be circumstances under which a disability that satisfies ABA Standard 9.32(i) would overcome the strong presumption that disbarment is the appropriate sanction for the intentional conversion of client funds. The question is theoretical, because respondent has not demonstrated that her mental disability satisfies ABA Standard 9.32(i).[5] Specifically, even assuming that respondent demonstrated some of the elements necessary to establish the existence of the mitigating factor described in 9.32(i), we are not persuaded that respondent has proved that a mental disability caused her misconduct.
a. Causation under ABA Standard 9.32(i)
Under ABA Standard 9.32(i), mental disability or chemical dependency is a mitigating factor only when "the **57 chemical dependency or mental disability caused the misconduct." The Bar contends that respondent failed to prove causation because she failed to prove that her disability deprived her of "the ability to appreciate the wrongfulness" of intentionally misappropriating client funds. The Bar relies on Martin , in which we used that phrase. 328 Or. at 190, 970 P.2d 638. Respondent concedes that she remained able to appreciate the wrongfulness of her conduct, but she contends that causation under ABA Standard 9.32(i) is satisfied if she was impaired to the extent that "she could not conform her behavior" to what she knew to be "the right thing." That theory of causation aligns with the trial panel's view of causation-that respondent's "misconduct would not have occurred absent the mental disability."[6]
Our cases suggest that whether a mental disability or chemical dependency can "cause" a lawyer's misconduct may depend upon the type of misconduct. For example, in the context of a negligent violation, we have applied ABA Standard 9.32(i) when the lawyer's depression "greatly contributed to his *11 misconduct" by diminishing "his ability to function." In re Cohen , 330 Or. 489, 503, 8 P.3d 953 (2000). In the context of "knowing" misconduct, which consisted of disregarding a court order to pay child support, we suggested that the lawyer's mental disability may have "caused" the misconduct because, "at least to some degree, that disability affected his ability to gain or maintain employment and hampered his ability to pay child support," although we determined that the lawyer failed to establish the other elements necessary to rely on ABA Standard 9.32(i). In re Chase , 339 Or. 452, 460, 121 P.3d 1160 (2005).
As the Bar emphasizes, however, in the context of intentional misconduct, we have demanded a more rigorous connection to establish that a disability caused the **58 misconduct. In In re Murdock , we concluded that the lawyer failed to demonstrate that his chemical dependence "caused" him to intentionally embezzle fees from his law firm, as required for ABA Standard 9.32(i), because, "at all times material to this proceeding, the accused was capable of recognizing right from wrong." In re Murdock , 328 Or. 18, 29-30, 968 P.2d 1270 (1998). It is simply more difficult to explain what it means for impairment to cause an intentional act than it is to explain how impairment could cause a lawyer to neglect a legal matter or to be unable to fulfill an obligation. Nevertheless, it is plausible that an impaired lawyer could demonstrate that the impairment caused the lawyer to engage in intentional misconduct if, as the trial panel reasoned, the lawyer would have been able to conform his or her conduct and refrain from engaging in the intentional misconduct "absent the mental disability."
b. Respondent did not prove causation
We are not persuaded, however, that respondent proved that she would have refrained from intentionally misusing client funds absent mental disability. Although respondent cites "the essence of Dr. Kronfli's opinion" to support her argument that mental disability made her unable to "conform her behavior to the right thing," that is a general interpretation of Kronfli's opinion. Kronfli testified that, in his opinion, respondent was impaired in her ability to practice law during the month of January 2015. He also offered the opinion that "it's possible that leading up to the January 2015 incident" respondent's "ability to practice law and keep her firm functioning appropriately began to diminish." Kronfli emphasized that he was not asserting that respondent's PTSD or depression caused her actions. Rather, the strongest opinion that Kronfli could offer was that "it's quite possible [respondent's] actions are because she did not have enough adaptive coping mechanisms." He explained that, "if she was under an overwhelming amount of stress," then symptoms of her mental disability were "likely to have caused her enough distress to perhaps influence or cause her to do something that she normally would not have done" if she had been managing her stress "in an appropriate or adaptive way." (Emphasis added.) Kronfli candidly acknowledged, however, that he had no information on which to base **59 an opinion about respondent's level of impairment before January 2015, except for respondent's report to him that "things had been building up." In fact, Kronfli was unwilling to commit to an opinion regarding respondent's level of impairment prior to "early January" 2015. Given how major depressive order is diagnosed, Kronfli testified, respondent's symptoms were occurring in the two weeks prior to her hospital admission, which "would put it in early January."
The relevant time period for respondent's misconduct began months before January 2015, and we are not persuaded by this record that, during the relevant time period, respondent was suffering from mental disability so severe that it prevented her from making the decisions that she knew to be correct and consistent with her obligations under the RPC. Warford testified that, if a person is suffering from depression severe enough to cause indecision and poor thinking, the person will also be suffering from poor reasoning and that those deficits will be apparent in multiple areas of life, not just one. Kronfli also appeared to equate the level of disability that could produce a lack of adequate coping mechanisms with the level of disability that would cause impaired ability to practice law, generally. Yet numerous *12 witnesses testified that respondent showed no evidence of thinking or reasoning deficits during the period of time in which she was engaging in the misconduct relating to her client trust accounts. Three members of respondent's office staff, as well as her landlord, all of whom observed respondent regularly and frequently during that period, testified that there had been nothing unusual in respondent's behavior, speech, or demeanor. Respondent's part-time legal assistant testified that respondent had not seemed agitated or overly stressed during the relevant time period. Her landlord, who is also a lawyer, observed that respondent had never displayed any sign of disorientation, agitation, or sadness, and he testified that respondent's recollection and knowledge of legal issues was "impressive." Moreover, respondent's client Godier, who spent considerable time with respondent preparing for his trial in December 2014 and January 2015, testified that, during that time, respondent appeared prepared, capable, professional, on-task, focused and confident, even on the day that she arrived late to trial because of the car accident. **60 We also are not persuaded that any disability that respondent may have been experiencing caused her to do something that she otherwise "would not have done." Respondent claims that mental impairment caused her to misappropriate McCarty's settlement funds in November and Godier's settlement funds in December, but her misconduct followed a pattern that began much earlier, and even respondent does not contend that she was suffering from mental illness symptoms before early September 2014.
Although respondent was not charged with misappropriating any client funds before McCarty's, the evidence shows that as early as Spring 2014 she was already engaged in a pattern of misusing her client trust account-using settlement funds from each new client to pay other clients whose funds earlier had been misused for other purposes. For example, when Brown's settlement check arrived on August 27, 2014, those funds were immediately disbursed for other purposes. Similarly, the funds from McCarty's settlement were used to pay two other clients, whose own settlement funds had been deposited and spent for other purposes some time before August 1. When asked by Bar disciplinary counsel to explain why she failed to hold the funds for the two clients who were paid with McCarty's funds, respondent did not deny acting intentionally-she wrote, instead, that there were reasons both clients wanted to wait to receive their funds, so "therefore no delay in making payments."
Moreover, there is evidence that, as early as February 2014, respondent was improperly using the funds in her client trust account. Respondent's landlord testified that, in February 2014, respondent asked for a loan of $7,000 because she had written a trust account check and did not think the account funds were sufficient to cover it. Because the landlord "knew the significance of overdrawing a client trust account," he loaned respondent the money. Not long after that loan, however, three checks written on respondent's client trust account were dishonored for insufficient funds in March and April 2014, and respondent's conduct came to the Bar's attention.
Although the Bar accepted respondent's explanation that those checks were dishonored because of an accounting **61 error, and although the Bar did not charge respondent with misappropriating Brown's funds, the pattern is too similar to ignore. For the months of November and December 2014, respondent admits intentionally misusing client funds but claims that she did so only because mental disability prevented her from "conforming her conduct"; but, as early as March 2014, she was also misusing client funds and claiming accounting errors or, worse, suggesting that she had no obligation to preserve client funds for the client. That respondent was unable to honor her obligation to preserve client trust funds before the alleged onset of her mental impairment, casts grave doubt on her claim that she would have honored her obligation with respect to McCarty's and Godier's funds but for impairment.
In short, we are not persuaded that respondent suffered from a mental disorder that impaired her functioning in a way that can be considered a cause of her intentional *13 misconduct. No mitigating factor justifies a reduction from the presumptive sanction of disbarment.[7]
Respondent is disbarred.

Amendments to the Oregon State Bar Rules of Procedure, which took effect January 1, 2018, use the term "respondent" to refer to the attorney who is charged with misconduct. See , e.g. , BR 1.1(x). Although trial panel was appointed on or before December 31, 2017, and therefore the amendments do not apply to this disciplinary proceeding, we use the new terminology throughout this opinion.

RPC 8.4(a)(3) provides:
"(a) It is professional misconduct for a lawyer to:
" * * * * *
"(3) engage in conduct involving dishonesty, fraud, deceit or misrepresentation that reflects adversely on the lawyer's fitness to practice law."
Conduct that violates RPC 8.4(a)(3) includes the "knowing conversion of client property, such as client funds" if the lawyer "exhibited the requisite intent such that the conversion constituted 'conduct involving dishonesty.' " In re Peterson , 348 Or. 325, 334-35, 232 P.3d 940 (2010) (some internal quotation marks omitted).

As we emphasized in Peterson , "[b]ecause an actor who mistakenly believes that his or her conduct is legal still can commit conversion, not all conversions implicate the prohibition in RPC 8.4(a)(3) against "conduct involving dishonesty." 348 Or. at 335, 232 P.3d 940.

The Bar urges this court to conclude that the circumstances of respondent's conduct support various aggravating factors, which the trial panel failed to consider. We need not prolong the opinion with a discussion of aggravating factors, however; because the presumptive sanction is disbarment, and because we ultimately conclude that disbarment is the appropriate sanction, a discussion of aggravating factors would not change the outcome.

Respondent expressly conceded that it is her burden to prove the existence of the mitigating factor. That concession is consistent with this court's discussion of the evidence in other cases involving ABA Standard 9.32(i). See In re Murdock , 328 Or. 18, 30, 968 P.2d 1270 (1998) (rejecting mitigating factor because lawyer had not "demonstrated that his chemical dependence 'caused' the misconduct"); In re McDonough , 336 Or. 36, 45, 77 P.3d 306 (2003) (concluding that chemical dependency was not an applicable mitigating factor, in part because the lawyer had "not established that he has accomplished a meaningful and sustained recovery from his alcohol dependency").

In adopting respondent's "unable to conform her conduct" standard for causation, the trial panel relied entirely on Commentary to ABA Standard 9.32 that was included in the 1992 version of the Standards. As of 2012, however, that Commentary is no longer part of the ABA Standards. 107-ADOPTED-Reaffirms ABA Standards for Imposing Lawyer Sanctions, available at https://www.americanbar.org/news/abanews/aba-news-archives/2013/08/107_-_adopted_-_reaf.html (accessed May 16, 2018) (reporting that American Bar Association reaffirmed the "black letter" of the ABA Standards, but "rescind[ed] its adoption of the Commentary thereto").

The trial panel rejected the accused's invocation of several other allegedly mitigating factors as unfounded or unsupported by the record. We agree with the trial panel's assessment, and further discussion will not benefit the bench or bar. The trial panel also identified two other mitigating factors-that respondent had a cooperative attitude toward the disciplinary proceedings, ABA Standard 9.32(e), and that she expressed remorse, ABA Standard 9.32(l). Although we agree that respondent proved those factors, they do not overcome the strong presumption that disbarment is the appropriate sanction in this case.